**2021 IL 125443**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 125443)

MEDPONICS ILLINOIS, LLC, Appellant, v. THE DEPARTMENT OF AGRICULTURE *et al.*, Appellees.

*Opinion filed May 20, 2021.*

JUSTICE OVERSTREET delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Theis, Neville, and Carter concurred in the judgment and opinion.

Justice Michael J. Burke took no part in the decision.

**OPINION**

¶ 1 The issue in this case involves certain provisions of the Compassionate Use of Medical Cannabis Pilot Program Act (Act) (410 ILCS 130/1 *et seq.* (West 2014)) and the correlating rules adopted by the Illinois Department of Agriculture (Administrative Rules) governing its enforcement of the relevant provisions of the

Act (see 8 Ill. Adm. Code 1000; 410 ILCS 130/15(b) (West 2014)) and how those impact the propriety of the proposed location of a medical cannabis cultivation center in conjunction with the zoning of two districts within the city of Aurora, Illinois.

¶ 2        Plaintiff, Medponics Illinois, LLC (Medponics), petitioned for administrative review of the decision of defendants, the Department of Agriculture, Director of Agriculture Raymond Poe, and the Department of Agriculture's chief of medicinal plants, Jack Campbell (collectively DOA), awarding a permit to defendant Curative Health Cultivation, LLC (Curative), to operate a medical cannabis cultivation center in Aurora, Illinois. The circuit court of Lake County reversed the DOA's decision. Defendants the DOA and Curative appealed. The appellate court reversed and ordered the permit reinstated to Curative. We allowed Medponics' petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019). For the following reasons, we affirm the judgment of the appellate court, reverse the judgment of the circuit court, and affirm the decision of the Department of Agriculture.

¶ 3                                    BACKGROUND

¶ 4        The Act took effect on January 1, 2014. 410 ILCS 130/999 (West 2014). The Act recognizes medical research that confirms the benefits of using cannabis in treating or alleviating symptoms associated with several incapacitating medical diagnoses. *Id.* § 5(a). The express purpose of the Act is "to protect patients with debilitating medical conditions, as well as their physicians and providers, from arrest and prosecution, criminal and other penalties, and property forfeiture if patients engage in the medical use of cannabis." *Id.* § 5(g).

¶ 5        The Act defines a "cultivation center" as "a facility operated by an organization or business that is registered by the [DOA] to perform necessary activities to provide only registered medical cannabis dispensing organizations with usable medical cannabis." *Id.* § 10(e). The DOA is charged with enforcing the provisions of the Act related to registering and overseeing medical cannabis cultivation centers. *Id.* § 15(b). Pursuant to that obligation, the Act directed the DOA to establish the Administrative Rules. *Id.* § 165(a). Effective July 25, 2014, the DOA adopted the Administrative Rules, governing its enforcement of the relevant provisions of the Act. See 38 Ill. Reg. 16732 (eff. July 25, 2014).

¶ 6        Section 105 of the Act sets forth, *inter alia*, requirements of and restrictions on medical cannabis cultivation centers. 410 ILCS 130/105 (West 2014). Pertinent here, section 105(c) of the Act provides that cultivation centers "may not be located within 2,500 feet of *** an area zoned for residential use." *Id.* § 105(c). The Act does not provide a definition for "area zoned for residential use." See *id.* § 10. However, in the Administrative Rules, the DOA defines "[a]rea zoned for residential use" as an "area zoned *exclusively* for residential use." (Emphasis added.) 8 Ill. Adm. Code 1000.10 (2014).

¶ 7        The Act charges the DOA with issuing medical cannabis cultivation center permits. 410 ILCS 130/85 (West 2014). As part of the cultivation center permit application process, the Administrative Rules require applicants to submit "[a] copy of the current local zoning ordinance to the [DOA] and verification from the local zoning authority that the proposed cultivation center is in compliance with the local zoning rules issued in accordance with Section 140 of the Act." 8 Ill. Adm. Code 1000.100(d)(17) (2015). Applicants must further submit a map of the area surrounding the proposed cultivation center that demonstrates that the proposed location is not located within 2500 feet of the property line of an area zoned for residential use (8 Ill. Adm. Code 1000.100(d)(19) (2015)), which the Administrative Rules indicate is an area zoned *exclusively* for residential use (8 Ill. Adm. Code 1000.10 (2014)).

¶ 8        The Administrative Rules provide that the DOA may award only one cultivation center permit in each of the 22 Illinois State Police (ISP) districts. 8 Ill. Adm. Code 1000.110(f) (2015). Applicants vying for a permit in the same ISP district are judged by means of a competitive scoring system and receive points in several different categories as set forth in the Administrative Rules. 8 Ill. Adm. Code 110(b), (c) (2015). The highest scoring qualified applicant is awarded the permit in the ISP district in which it applied. 8 Ill. Adm. Code 110(f)(1) (2015).

¶ 9        In September 2014, Medponics and Curative both submitted applications to the DOA for the medical cannabis cultivation center permit award in ISP District 2. Medponics sought to operate a cultivation center in Zion, Illinois, and Curative sought to operate a cultivation center in Aurora, Illinois.

¶ 10       On October 14, 2014, Curative filed a special use petition with the City of Aurora, seeking authorization to use its proposed location as a medical cannabis

cultivation center. On November 5, 2014, upon referral of Curative's special use petition by the Aurora City Council, the Aurora Planning Commission conducted a public hearing and found the petition met the standards of the Aurora Zoning Ordinance (Zoning Ordinance), recommended conditional approval of the special use, and granted the special use permit to Curative, subject to conditions involving landscaping on the property and review of the petition documents in the event a state license was issued for the subject property. On November 6, 2014, the Aurora Planning and Development Committee conducted a special meeting and recommended approval of Curative's special use permit.

¶ 11       On November 18, 2014, a city ordinance was passed and approved, granting Curative a special use permit for a medical cannabis cultivation center on the property. City of Aurora Ordinance No. O14-068 (eff. Nov. 18, 2014). The ordinance indicates that the location of the proposed cultivation center is zoned as "M-2(S) Manufacturing—General." *Id.*

¶ 12       On April 29, 2015, the zoning administrator for the City of Aurora sent a letter to the DOA's general counsel, regarding "Aurora Non-'Exclusively Residential' Zoning [N]ear Curative Health Cultivation, LLC at 2229 Diehl Road, Aurora, Illinois." The letter advised that the location of Curative's proposed cultivation center was not within 2500 feet of any area zoned exclusively for residential use for purposes of the Act because the Zoning Ordinance allows special use permits for uses other than residential in residential districts, including the R-1 and R-5 districts. The letter referenced a "Frequently Asked Questions" (FAQ) document located on the DOA website dated February 18, 2015, which addressed the issue as follows:

> "The definition of 'area zoned residential' is an area zoned 'exclusively residential.' If the local municipality provides a letter that its zoning districts located within 2500 feet of a cultivation center are not zoned 'exclusively' residential because in addition to residential uses, the zoning districts allow for other uses such as churches, parks, schools, utility substations, and/or other planned uses including commercial uses, will that satisfy this requirement?
>
> *Yes, but the applicant must verify setback regulations are also met, located in [DOA] Administrative Rules section 1000.40(e). The [DOA] will rely heavily on the local zoning authority's approval.*" Ill. Dep't of Agric., Medical

Cannabis Pilot Program Frequently Asked Questions 3 (Feb. 18, 2015), https://www2.illinois.gov/sites/agr/Plants/MCPP/Documents/mcppfaq.pdf [https://perma.cc/MP5Z-TFXR].

¶ 13    On October 30, 2015, the DOA awarded the cultivation center permit to Curative and notified Medponics in a letter that its permit application was denied. Of all permit applicants in ISP District 2, Curative finished first in scoring, while Medponics finished fifth. Medponics was the only applicant to challenge the DOA's decision to award the permit to Curative.

¶ 14    The operative complaint in this case—a verified, second-amended complaint for administrative review—was filed on February 24, 2017. Pursuant to the second-amended complaint, Medponics alleged, *inter alia*, that it submitted to the DOA an application for a permit to operate a medical cannabis cultivation center in Zion, Illinois—located within ISP District 2—but the DOA deemed Curative as the highest scoring applicant in ISP District 2. Accordingly, the DOA awarded Curative the cultivation center permit and advised Medponics that its application was denied. Medponics alleged that Curative's application contained a fatal, disqualifying flaw, namely that the proposed location of Curative's cultivation center was "well within 2,500 feet of multiple properties zoned as exclusively residential in Aurora, Illinois," in violation of section 105(c) of the Act. See 410 ILCS 130/105(c) (West 2014).

¶ 15    Medponics alleged that the location of Curative's proposed cultivation center violated the Act because it was located within 2500 feet of the R-1 and R-5 districts in Aurora, both of which Medponics alleged were zoned exclusively for residential use. Accordingly, Medponics requested the circuit court to reverse the DOA's award of the cultivation center permit to Curative and award the permit to Medponics.

¶ 16    Defendants responded that Medponics misapplied the location restriction provided in section 105(c) of the Act. Defendants indicated that the location restriction, as interpreted by the DOA in its Administrative Rules, requires that a cultivation center must be more than 2500 feet from an area zoned *exclusively* for residential use. See 8 Ill. Adm. Code 1000.10 (2014). Defendants further argued that no areas in Aurora were zoned exclusively for residential use. Defendants emphasized that the DOA found Curative's proposed location satisfied the location

requirement set forth in the Administrative Rules because it was not within 2500 feet of an area zoned exclusively for residential use due to the multiple nonresidential uses authorized in Aurora's R-1 and R-5 districts. Defendants argued that the DOA properly declined to disqualify Curative on the basis of any location requirement violation. Accordingly, defendants requested the circuit court to enter an order affirming the DOA's decision to award the permit to Curative.

¶ 17    On August 24, 2017, the circuit court entered an order setting aside the DOA's decision awarding the permit to Curative, finding clearly erroneous the DOA's interpretation of the Administrative Rules that the setback requirement applies exclusively to areas where only residences are permitted. The circuit court concluded that the City of Aurora defined the R-1 and R-5 districts as "zoned exclusively for residential purposes," notwithstanding that this designation allowed certain additional special uses in the districts. The circuit court indicated that these districts remained exclusively residential and, by the very terms of the DOA's rule, the Curative facility may not be within 2500 feet of areas zoned as exclusively residential.

¶ 18    The circuit court further observed that neither the Act nor the Administrative Rules contain a special use permit exception to the "area zoned for residential use" requirement. The circuit court indicated that defendants' position was inconsistent with the plain meaning of the statute and that the mere fact that hospitals, cemeteries, and other establishments are granted special use permits to operate in the areas zoned exclusively for residential purposes does not take those areas out of the purview of the Act or the Administrative Rules. The parties agreed that the R-1 and R-5 districts are within 2500 feet of the proposed location of Curative's cultivation center, and the circuit court found those districts to be zoned exclusively for residential use. Accordingly, the circuit court concluded that Curative's proposed location violated both the Act and the Administrative Rules and held the DOA's decision to award the permit to Curative was clearly erroneous.

¶ 19    The circuit court indicated that its finding that Curative did not qualify for the permit was not a suggestion that Medponics should be awarded the permit. Citing section 1000.40(d) of the Administrative Rules, the circuit court noted that, in the event an awardee forfeits a permit, the permit shall be awarded to the next highest qualified applicant in terms of points. See 8 Ill. Adm. Code 1000.40(d) (2014).

Accordingly, the circuit court remanded the case for the DOA to rescore and reassess the award in ISP District 2. The circuit court ordered defendants to file the sealed and redacted version of the administrative record within 14 days and continued the matter for 21 days, or until September 14, 2017, for entry of a final order once the record was filed as ordered.

¶ 20     On September 12, 2017, the City of Aurora filed a petition to intervene, contending the circuit court's interpretation of Aurora's zoning categories as "exclusively residential" related to the validity and integrity of the Zoning Ordinance and the circuit court's interpretation contradicted those of the Aurora zoning administrator contained in the April 29, 2015, letter to the DOA's general counsel. The City of Aurora argued that the petition to intervene was timely, as the circuit court's order of August 24, 2017, was not final.

¶ 21     On September 13, 2017, defendants filed a joint motion to supplement the administrative review record with the following documents: (1) the permit award letter dated October 30, 2015, from the DOA to Curative, (2) City of Aurora Ordinance O14-068, which granted Curative a special use permit for a medical cannabis cultivation center, and (3) the letter dated April 29, 2015, from Aurora's zoning administrator to the DOA's general counsel regarding the "exclusively residential" issue. The motion indicated that (1) the letter was located after the August 24, 2017, administrative review hearing in the circuit court, (2) the letter predates the DOA's October 30, 2015, award of the cultivation center permit to Curative, and (3) the letter "was clearly considered as part of the application process" because it predated the permit award.

¶ 22     On November 3, 2017, the circuit court conducted a hearing on both the petition to intervene and the joint motion to supplement the administrative review record. The circuit court denied the petition to intervene as untimely, finding it "hard to believe that the City of Aurora had absolutely no knowledge that this case was pending or that Medponics was challenging the award by the [DOA]." The circuit court acknowledged that its August 24, 2017, order required an interpretation of the Zoning Ordinance's zoning definitions. However, it emphasized that the only remaining issue involved whether the DOA properly awarded the permit to Curative based on the language of the Act and the Administrative Rules. Finally,

the circuit court noted that Medponics and Curative were the most directly affected parties and the City of Aurora's economic interest in the litigation was remote.

¶ 23 The circuit court granted in part and denied in part the joint motion to supplement the administrative review record. It allowed the October 30, 2015, permit award letter and City of Aurora Ordinance O14-068 but denied the April 29, 2015, letter from Aurora's zoning administrator to the DOA, finding no evidence that the DOA ever reviewed the letter or considered it in awarding the permit.

¶ 24 On November 30, 2017, the circuit court entered its final order, incorporating the August 24, 2017, order and granting Curative's request for a stay of judgment (Ill. S. Ct. R. 305(b) (eff. July 1, 2017)), pending appeal of the judgment. The circuit court found no just reason for delaying either enforcement or appeal of the order. Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016).

¶ 25 Defendants appealed, arguing, *inter alia*, that the circuit court erred in finding that Curative's proposed cultivation center was within 2500 feet of an area zoned "exclusively" for residential use. The appellate court reversed, finding that judicial deference to the DOA's interpretation of the Act and its Administrative Rules was required because, although Medponics' position was reasonable, the DOA's position was not clearly erroneous, arbitrary, or unreasonable. 2019 IL App (2d) 170977-U, ¶ 35. Accordingly, the appellate court reversed the judgment of the circuit court and affirmed the DOA's decision. *Id.* ¶ 45. This court allowed Medponics' petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2019).

¶ 26                                     ANALYSIS

¶ 27 In this appeal, we determine the propriety of the DOA's award of the cultivation center permit to Curative. To do so, we must consider whether the R-1 and R-5 districts in Aurora are zoned exclusively for residential use, per the DOA's interpretation of the location requirement as set forth in the Administrative Rules. The DOA found that Curative's proposed location satisfied the location requirement because it was not within 2500 feet of an area zoned exclusively for

residential use due to the multiple nonresidential uses authorized in the R-1 and R-5 districts.[1]

¶ 28 In an administrative review action, we review the decision of the administrative agency rather than that of the circuit court or the appellate court. *Roselle Police Pension Board v. Village of Roselle*, 232 Ill. 2d 546, 551-52 (2009). Pursuant to section 155 of the Act, judicial review of the decision of the DOA in this case is governed by the Administrative Review Law set forth in article III of the Code of Civil Procedure (735 ILCS 5/3-101 *et seq.* (West 2014)) and the rules adopted thereunder. 410 ILCS 130/155 (West 2014). Section 3-110 of the Administrative Review Law provides that the scope of judicial review of an administrative decision is extended to all questions of law and fact presented in the record before the court. 735 ILCS 5/3-110 (West 2014).

¶ 29 The applicable standard of review will determine the level of deference given to the administrative agency's decision and is contingent on whether the question is one of fact, one of law, or a mixed question of law and fact. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001). If the question presented is one of fact, the administrative agency's factual findings are considered *prima facie* correct and will only be reversed by the reviewing court if they are against the manifest weight of the evidence. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 540 (2006). Questions of law are subject to *de novo* review. *AFM Messenger Service*, 198 Ill. 2d at 390. Mixed questions of law and fact are reviewed under the clearly erroneous standard. *Id.* at 391. A mixed question is one where the facts are admitted, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard or whether the rule of law is violated when applied to the established facts. *Id.*

¶ 30 The facts here are undisputed, as the parties agree that the proposed location of Curative's cultivation center is closer than 2500 feet to the R-1 and R-5 districts in Aurora. However, the rule of law is contested, as the parties disagree on the

---

[1]Medponics asserts in a preliminary statement in its opening brief that deference to the DOA's interpretation of "area zoned for residential use" is not necessary because that language in the Act is unambiguous. Medponics never raised this below and instead impliedly presumed the ambiguity in proceeding to argue the propriety of the Administrative Rules construing the Act. Thus, we likewise proceed to address the propriety of the DOA's interpretation of its own Administrative Rules and how that interpretation impacts the validity of the location of Curative's cultivation center.

propriety of the DOA's interpretation of the location requirement in the Administrative Rules (see 8 Ill. Adm. Code 1000.10 (2014)) and the application of that interpretation to the zoning of the R-1 and R-5 districts in Aurora. Accordingly, the question is one of law, which we review *de novo*. *AFM Messenger Service*, 198 Ill. 2d at 390; see also *Roselle Police Pension Board*, 232 Ill. 2d at 552 (issues of statutory construction are questions of law which are reviewed *de novo*).

¶ 31    Notwithstanding our *de novo* standard of review, regulations adopted by an administrative agency are presumptively valid. *Hartney Fuel Co. v. Hamer*, 2013 IL 115130, ¶ 38. Moreover, even applying a *de novo* review, an agency's interpretation of its own regulations is entitled to substantial deference and weight, as the agency makes informed judgments based on its expertise and experience and provides a knowledgeable source in ascertaining the intent of the legislature. *Id.* Additionally, an agency's interpretation of a statute is given deference on *de novo* review unless it is erroneous, unreasonable, or conflicts with the statute. *Hadley v. Illinois Department of Corrections*, 224 Ill. 2d 365, 371 (2007).

¶ 32    To resolve the issue on appeal, we apply principles of statutory construction to the question of the DOA's interpretation of the location requirement in the Administrative Rules in conjunction with the relevant provisions of the Zoning Ordinance regarding the zoning of the R-1 and R-5 districts, as applied to the location of Curative's cultivation center. See *People ex rel. Madigan v. Illinois Commerce Comm'n*, 231 Ill. 2d 370, 380 (2008) (administrative rules have force and effect of law and are construed under the standards governing construction of statutes); *City of Chicago v. Morales*, 177 Ill. 2d 440, 447 (1997) (same rules governing statutory construction are applied to construing municipal ordinances).

¶ 33    Medponics first argues that the location of Curative's proposed cultivation center is within 2500 feet of the R-1 and R-5 districts in Aurora, which Medponics alleges are zoned exclusively for residential use. Citing section 4.1 of the Zoning Ordinance, Medponics points out that the City of Aurora is divided into "Use Districts." City of Aurora Ordinance No. O15-062, § 4.1 (approved Oct. 13, 2015). Section 4.1 identifies the R-1 and R-5 districts as "residential districts." *Id.* District R-1 is a one-family dwelling district and district R-5 is a multiple-family dwelling district. *Id.*

¶ 34    Medponics concedes that the Zoning Ordinance does not define "residential district" but asserts that it defines "residential area" as "[a] zoning lot or portion of a zoning lot designed or used exclusively for residential purposes." *Id.* § 3.3. Medponics thus contends that the ordinary meanings of "district" and "area," when viewed in the context of the purpose of the R-1 and R-5 districts, establish that the R-1 and R-5 "residential districts" are synonymous with "residential areas," which per section 3.3 of the Zoning Ordinance are "used exclusively for residential purposes." See *id.* Accordingly, Medponics argues that the location of Curative's proposed cultivation center violates the Act's location requirement and the DOA's Administrative Rules governing that requirement because it is less than 2500 feet from the R-1 and R-5 districts, both of which are zoned exclusively for residential use under the Zoning Ordinance.

¶ 35    Defendants respond that the Zoning Ordinance clearly provides for nonresidential uses in the R-1 and R-5 districts and contains nothing to indicate that entire districts are to be "exclusively residential." We agree with defendants. A review of the entirety of the Zoning Ordinance refutes Medponics' argument that "residential districts" and "residential areas" are synonymous.[2] Section 7 of the Zoning Ordinance governs "residential districts." *Id.* § 7. Section 7.1 of the Zoning Ordinance enumerates the purposes of residential districts. *Id.* § 7.1. Again, Medponics contends that the ordinary meanings of "district" and "area" establish that the R-1 and R-5 "residential districts" are also "residential areas," "particularly when considered *within the context of the intent and purpose* of the R-1 and R-5 districts." (Emphasis added.)

¶ 36    The purposes of residential districts are set forth in section 7.1 of the Zoning Ordinance and contradict Medponics' argument. *Id.* Indeed, three of those purposes expressly provide that residential districts are established "[t]o protect *residential areas*" from various hazards and perils. (Emphasis added.) *Id.* §§ 7.1-1.1, 1.2, 1.3.

<hr>

[2]Although certain sections of the Zoning Ordinance are not included in the administrative record, we take judicial notice of the omitted sections as they appear in the current zoning ordinance for the purpose of construing the ordinance as a whole. Aurora Code of Ordinances, Appendix A (amended Feb. 25, 2020); see *People v. Beachem*, 229 Ill. 2d 237, 243 (2008) (when interpreting a statute, the statute is construed as a whole; words and phrases are not viewed in isolation but are considered in light of other provisions of the statute); *Charles v. City of Chicago*, 413 Ill. 428, 435 (1953) (court may properly take judicial notice of zoning ordinances).

The fact that the Zoning Ordinance references residential districts and residential areas separately in the same section makes clear that these terms are distinct. The pronouncement that residential districts were created, in part, to protect residential areas further supports that these terms are not interchangeable.

¶ 37　　　　Moreover, as noted, the Zoning Ordinance defines "residential area" as "[a] zoning lot or portion of a zoning lot designed or used exclusively for residential purposes." *Id.* § 3.3. A "zoning lot" is defined as "[a] plot of ground, made up of one (1) or more parcels that is or may be occupied by a use, building[,] or buildings including the open spaces required by this ordinance." Aurora Code of Ordinances, Appendix A, § 3.3 (amended Feb. 25, 2020). If a residential area may be composed of a portion of a zoning lot, and a zoning lot in turn may be composed of only one parcel, a residential area could potentially consist of less than one parcel. This likewise establishes that a residential district is not the same as a residential area, as the Zoning Ordinance gives no indication that an entire residential district may consist of only one parcel or a portion thereof. The Zoning Ordinance is devoid of support for Medponics' position that the R-1 and R-5 residential districts are the same as residential areas.

¶ 38　　　　The DOA asserts that Medponics' suggestion—that the location requirement is violated when a proposed cultivation center is located within 2500 feet of any area zoned as a residential district—does not comport with the plain language of the Administrative Rules. We agree. The Administrative Rules address a particular instance where the location requirement is violated merely because an area within 2500 feet of a proposed cultivation center is zoned as a residential district, namely when the municipality's population exceeds 2 million people. The relevant provision is situated in the Administrative Rules at the end of the definition of "area zoned for residential use." 8 Ill. Adm. Code 1000.10 (2014). According to that provision: " 'Area zoned for residential use' means an area zoned exclusively for residential use; *provided that, in municipalities with a population over 2,000,000 people, 'an area zoned for residential use' means an area zoned as a residential district or a residential planned development.*" (Emphasis added.) *Id.* Accordingly, this provision eliminates the "zoned exclusively for residential use" requirement in cities with populations exceeding 2 million people and only requires the relevant area to be zoned as a residential district or residential planned development. *Id.*

¶ 39    If we were to accept Medponics' suggestion that the location requirement is automatically violated when a proposed cultivation center is within 2500 feet of any area zoned as a residential district, the above-referenced provision would be rendered superfluous. See *People ex rel. Illinois Department of Corrections v. Hawkins*, 2011 IL 110792, ¶ 23 (courts will not interpret a statute in such a way that renders any part of it superfluous or meaningless). If the DOA had intended the location requirement to be violated every time a proposed cultivation center was within 2500 feet of an area merely zoned as a residential district, it would not have included the above provision making the same applicable to cities exceeding 2 million people. See 8 Ill. Adm. Code 1000.10 (2014). For these reasons, we reject Medponics' argument that the location of Curative's proposed cultivation center is within 2500 feet of the R-1 and R-5 districts in Aurora, which Medponics alleges are zoned exclusively for residential use.

¶ 40    Medponics next argues that the DOA's interpretation of the location requirement in the Administrative Rules impermissibly treats special use permits as zoning amendments. Medponics distinguishes zoning amendments from special uses, asserting that a zoning amendment changes the original zoning ordinance (*Jones v. City of Carbondale*, 217 Ill. App. 3d 85, 89 (1991)), while a special use is permitted within a zoning district by the zoning ordinance so long as the use satisfies certain criteria (*City of Chicago Heights v. Living Word Outreach Full Gospel Church & Ministries, Inc.*, 196 Ill. 2d 1, 16 (2001)). Medponics further cites caselaw indicating that special uses do not change the zoning designations of the districts in which the special uses occur. See *Consumers Illinois Water Co. v. County of Will*, 220 Ill. App. 3d 93, 96 (1991) (creation of a special use in existing zoning district does not change the underlying zoning map or zoning classification); *County of Cook v. Monat*, 365 Ill. App. 3d 167, 175 (2006) (special use is not the equivalent of zoning amendment).

¶ 41    Medponics references defendants' argument below that the R-1 and R-5 districts are not zoned exclusively for residential use because the Zoning Ordinance allows special use permits for nonresidential uses in those districts. Medponics then mischaracterizes this argument, alleging that defendants "thus maintain that the availability of special use permits within these districts changes their zoning designations to something other than exclusively residential." We disagree and emphasize that the manner in which Medponics frames this argument incorporates

- 13 -

a presumption that the R-1 and R-5 districts are zoned as exclusively residential— an issue that we are called on to resolve in this appeal.

¶ 42     We find nothing to indicate that defendants in any way advanced this argument as Medponics claims. Nor is there any suggestion in the Zoning Ordinance that the R-1 and R-5 districts are, or ever were, zoned as exclusively residential. Although R-1 and R-5 are designated as "residential districts," the Zoning Ordinance demonstrates that they are not zoned exclusively for residential use as contemplated by the location requirement in the Administrative Rules. 8 Ill. Adm. Code 1000.10 (2014).

¶ 43     Section 20 of the Zoning Ordinance titled "Use Categories" presents a chart in "Table One" illustrating all the authorized uses in the districts of Aurora. Aurora Code of Ordinances, Appendix A, Table 1 (amended Feb. 25, 2020). The use categories confirm that nonresidential uses in the R-1 and R-5 districts are authorized by special use permits. Such uses include housing services for the elderly; major community residences; transitional community residences; transportation services; air passenger transportation terminals; rail transportation; nonresidential parking facilities; above-ground communication facilities; electric utility facilities; utilities and utility services; community centers; public or private golf courses; educational services; public facilities and services; health and human services; day cares; nursing, supervision, and other rehabilitative services; hospitals or sanatoria; mental health facilities; cemeteries or mausoleums; social service agencies; charitable organizations; health-related facilities and similar uses when not operated for pecuniary profit; and planned development. *Id.*

¶ 44     In addition to the nonresidential uses requiring special use permits, the use categories also include several other nonresidential uses in the R-1 and R-5 districts that do *not* require special use permits. *Id.* These uses are classified as accessory uses, permitted-by-right uses, and limited-but-permitted uses. *Id.* Such uses include home occupations, minor community residences, automated business devices, garage sales, residential parking facilities, alternative energy systems, public drinking water well houses, natural and other recreational parks, convents, monasteries, rectories, parsonages, ministerial homes, parish houses, reading rooms, truck gardening, stormwater management facilities, drainage areas, and common landscaping areas. *Id.* Nonresidential uses classified as "permitted but

- 14 -

may require a Special Use" are also authorized in the R-1 and R-5 districts and apply to religious institutions. *Id.*

¶ 45     Because of the numerous nonresidential uses in those districts as established by the Zoning Ordinance—some requiring special use permits and others not—we conclude that the R-1 and R-5 residential districts are not zoned exclusively for residential use. Accordingly, we reject Medponics' argument that the DOA's interpretation of "area zoned exclusively for residential use" impermissibly treats special use permits as zoning amendments.

¶ 46     Medponics next argues that the appellate court erred in basing its decision on material outside the administrative record. As observed, section 3-110 of the Administrative Review Law provides that the scope of judicial review of an administrative decision is extended to all questions of law and fact presented *in the record before the court*. 735 ILCS 5/3-110 (West 2014); see also *Krachock v. Department of Revenue*, 403 Ill. 148, 152 (1949) (on administrative review, court may act only upon the record).

¶ 47     Here, Medponics asserts that, in making its decision, the appellate court considered two items that were not included in the administrative record: (1) the April 29, 2015, letter from the City of Aurora to the DOA advising that the location of the proposed cultivation center was not within 2500 feet of any area zoned exclusively for residential use and (2) the FAQ document located on the DOA website, which the City of Aurora referenced in the April 29, 2015, letter.

¶ 48     Medponics protests that, although the letter was not a part of the administrative record, the appellate court discussed it in the "Background" section of its opinion "as if it were a part of the administrative record." According to Medponics, this demonstrates that the appellate court erroneously considered the letter in reaching its decision. Medponics further contends that, although the FAQ document predated the DOA's award of the permit to Curative, no evidence in the administrative record indicates that the DOA relied on it as part of the permit application process. Accordingly, Medponics claims that, in addition to the letter, the appellate court also erroneously relied on the FAQ document in reaching its decision.

¶ 49     We do not necessarily agree that the DOA did not consider the letter in making its decision to award the permit to Curative, given that the Administrative Rules

- 15 -

require each applicant to submit, *inter alia*, verification from the local zoning authority that the property location complies with the local zoning rules issued in accordance with section 140 of the Act. See 8 Ill. Adm. Code 1000.100(d)(17) (2014). However, the letter was not included in the administrative record, as the record reflects that it was located after the administrative review hearing and the circuit court denied defendants' joint motion to supplement the administrative record with the letter. That decision was challenged by defendants in the appellate court, thus providing a plausible explanation as to why the subject material was discussed in the "Background" section of the order. 2019 IL App (2d) 170977-U, ¶ 8. However, given its reversal of the circuit court's administrative review findings, the appellate court declined to address the issue regarding the joint motion to supplement the administrative record. *Id.* ¶ 43. Nor is that issue before this court, as defendants did not raise it on cross-appeal.

¶ 50       We reiterate that, in this administrative review, we determine the propriety of the decision of the DOA rather than that of the circuit court or the appellate court. *Roselle Police Pension Board*, 232 Ill. 2d at 551-52. Moreover, on administrative review, we make our determinations based on anything that appears in the administrative record, regardless of whether the lower courts relied on that ground. *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 34.

¶ 51       Applying these principles to the case at bar, we find ample evidence in the administrative record to support our decision, independent of the letter and the FAQ document. We emphasize that the letter memorializes what is readily ascertainable in the Zoning Ordinance, which *is* included in the administrative record. Although we discuss the letter and the FAQ document in our opinion, we do so for the limited purpose of addressing Medponics' claim that the appellate court improperly relied on these items in reaching its decision. Whether the appellate court relied on the letter and/or the FAQ document is of no consequence here because we do not rely on them, and any action of the lower courts does not influence our decision. See *Roselle Police Pension Board*, 232 Ill. 2d at 551-52; *Village of Bartonville*, 2017 IL 120643, ¶ 34. For these reasons, we find immaterial Medponics' argument that the appellate court improperly relied on the letter and the FAQ document.

¶ 52       Finally, Medponics argues that the location requirement as interpreted by the DOA impermissibly limits the scope of the Act. See *Hadley*, 224 Ill. 2d at 377

(rules adopted by agency may not limit the statutory scope). At the outset, we note that Medponics forfeited this argument by not raising it in the lower courts. See *1010 Lake Shore Ass'n v. Deutsche Bank National Trust Co.*, 2015 IL 118372, ¶ 14 (issues not raised in the circuit court or appellate court are forfeited). However, forfeiture notwithstanding, we opt to address this claim on the merits. See *Klaine v. Southern Illinois Hospital Services*, 2016 IL 118217, ¶ 41 (forfeiture is a limitation on the parties, which may be overlooked by reviewing court in interest of maintaining a uniform body of precedent).

¶ 53        Medponics alleges that, under the DOA's interpretation, the location requirement does not apply to all municipalities in the State but only to "those which do not allow special use permits for non-residential uses in areas zoned exclusively residential." We disagree and perceive in this statement the inference that the location requirement does not apply to the City of Aurora under the DOA's interpretation. We further note that Medponics frames this argument in a manner that once again incorporates a presumption that the R-1 and R-5 districts are zoned as exclusively residential—an allegation that, as explained above, is not supported by the language of the Zoning Ordinance.

¶ 54        Nevertheless, Medponics cites *Hadley*, 224 Ill. 2d 365, to support its argument. In *Hadley*, the plaintiff inmate filed a class action lawsuit seeking to enjoin the Illinois Department of Corrections (DOC) from charging indigent inmates a $2 co-pay for nonemergency medical and dental treatment. *Id.* at 367. The Unified Code of Corrections (UCC) (730 ILCS 5/3-6-2(f) (West 2004)) provided that an indigent inmate is "exempt" from such a co-pay. *Hadley*, 224 Ill. 2d at 368. However, the DOC's rules provided that the accounts of indigent inmates were to be charged for the co-pays and the inmate could apply for an indigence exemption upon release to satisfy the balance due. *Id.* at 372-74. This Court held the DOC's rule was clearly erroneous, as it restricted the scope of the UCC's indigence exemption by excluding inmates serving life sentences. *Id.* at 376. Under the DOC's rule, no action could be taken on the UCC's exemption until discharge from the DOC—an occurrence that could never be realized by inmates incarcerated for life. *Id.* Medponics asserts that the DOA's interpretation of the Administrative Rules here impermissibly limits the scope of the Act's location requirement, as did the DOC's interpretation of the rule in *Hadley*. We disagree.

¶ 55    As previously observed, the General Assembly charged the DOA with the duty of enforcing the provisions of the Act related to registering and overseeing medical cannabis cultivation centers. 410 ILCS 130/15(b) (West 2014). The General Assembly granted the DOA latitude by directing it to adopt rules governing its enforcement of the Act. *Id.* § 15(a). In facilitating its roles, the DOA saw fit to provide a definition for the Act's reference to "area zoned for residential use." See *id.* § 105(c). Accordingly, the DOA defined that term in the Administrative Rules as an "area zoned exclusively for residential use." 8 Ill. Adm. Code 1000.10 (2014).

¶ 56    The DOA was also duty bound to ensure the Zoning Ordinance was not in conflict with the Act. See 8 Ill. Adm. Code 1000.100(d)(17) (2015); 410 ILCS 130/85(e)(2) (West 2014). To that regard, the City of Aurora was versed on the requirements of the Act well before it issued the special use permit to Curative. The City of Aurora passed an ordinance on July 22, 2014, amending its zoning to, *inter alia*, authorize medical cannabis cultivation centers in the city as a special use in zoning districts ORI, M-1, and M-2, so long as the cultivation centers complied with, *inter alia*, the "geographic location restrictions, as set forth in the *** Act." City of Aurora Ordinance No. O14-042 § 4.3-3(N)(i) (eff. July 22, 2014).

¶ 57    Contrary to Medponics' claims, the location requirement as interpreted by the DOA applies equally to all municipalities statewide. The DOA approved Curative's proposed location after determining that the R-1 and R-5 districts are not zoned exclusively residential due to the multitude of nonresidential uses authorized in those districts. The location requirement contains requisite criteria. The mere fact that the criteria are not met in a particular municipality does not mean that the location requirement is inapplicable to the municipality. Here, the location requirement and its requisite criteria fully apply to the City of Aurora. However, the criteria were met because Curative's proposed cultivation center is not located within 2500 feet of an area zoned exclusively for residential use. We find nothing to establish that the location requirement as interpreted by the DOA impermissibly limits the scope of the Act. Accordingly, we reject Medponics' argument.

¶ 58    In conclusion, we do not find that the DOA's interpretation of the location requirement is erroneous, unreasonable, or in conflict with the Act. See *Hadley*, 224 Ill. 2d at 371. To the contrary, we are satisfied that the definition is reasonable and that it harmonizes with the purpose of the Act—to protect patients and their

- 18 -

providers from prosecution for using medical cannabis to treat debilitating medical conditions. 410 ILCS 130/5(g) (West 2014). Thus, we give due deference to the DOA's reasonable interpretation of the location requirement of the Act. See *Hartney Fuel Co.*, 2013 IL 115130, ¶ 38.

¶ 59                                      CONCLUSION

¶ 60       For the foregoing reasons, we conclude that the DOA properly awarded the cultivation center permit to Curative. Accordingly, we affirm the judgment of the appellate court and reverse the judgment of the circuit court.

¶ 61       Appellate court judgment affirmed.

¶ 62       Circuit court judgment reversed.

¶ 63       Department decision affirmed.

¶ 64       JUSTICE MICHAEL J. BURKE took no part in the consideration or decision of this case.