2024 IL App (1st) 230910-U

No. 1-23-0910

Order filed September 23, 2024

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| BELINDA LUGO, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2022 CH 05376 |
| | ) | |
| THE DEPARTMENT OF CHILDREN AND FAMILY | ) | |
| SERVICES and MARC D. SMITH, in his Official | ) | |
| Capacity as Director of Children and Family Services, | ) | |
| | ) | Honorable |
| Defendants-Appellees. | ) | Alison C. Conlon, |
| | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Decision of the Director of Children and Family Services to deny plaintiff's request
to expunge indicated findings of child neglect is affirmed.

¶ 2    Plaintiff Belinda Lugo appeals *pro se* from an order of the circuit court of Cook County

which affirmed a final administrative decision of the Director of Children and Family Services

denying her request to expunge indicated findings of child neglect against her that were entered

into the State Central Register. See 325 ILCS 5/7.7 (West 2022). On appeal, Lugo contends that the evidence does not support the indicated findings of lock out, inadequate supervision, and environment injurious to health and welfare (neglect). We affirm.

¶ 3                                    I. Background

¶ 4      Lugo is the mother of Nicole Lugo, who is the mother of M.F., T.F., T.L., and A.L.[1] In 2011, Lugo became the legal guardian of M.F. and T.F. Lugo became the foster parent through Aunt Martha's Health and Wellness Center (Aunt Martha's) of T.L. and A.L. at their respective births after Nicole tested positive for "something" at the hospital.

¶ 5      In May 2021, the Department of Children and Family Services (DCFS) received a hotline call reporting suspected child abuse and neglect against Lugo. DCFS investigated the report based on, as relevant here, two incidents. Following its investigation, DCFS determined that credible evidence supported indicated findings that Lugo neglected M.F., T.F., T.L., and A.L. In July 2021, DCFS sent Lugo a letter informing her that she was being indicated for environment injurious to health and welfare (neglect), inadequate supervision, and lock out. The letter also informed Lugo that, as a person indicated for child neglect, her name would be maintained on the State Central Register for five years. Lugo timely filed a request for an administrative appeal, seeking an expungement of the indicated findings from the Register.

¶ 6      On January 27, 2022, and March 17, 2022, an administrative law judge (ALJ) conducted a hearing on Lugo's expungement request to determine whether the DCFS report complied with the Abused and Neglected Child Reporting Act (ANCRA) (325 ILCS 5/1 *et seq.* (West 2022)).

_____

[1] Because Nicole Lugo shares the same last name as plaintiff, we refer to Nicole by her first name.

¶ 7    At the hearing, Yaide Ortiz testified that she is M.F.'s aunt and lives about two blocks from Lugo. In May 2021, M.F., then 16 years old, came to her house on two separate occasions stating that he had been "kicked out" of Lugo's house. The first such incident occurred around 6 or 7 p.m., with M.F. explaining that Lugo got mad because he came home a little late. M.F. stated that Lugo took his keys and would not let him in the house. Ortiz thought M.F. was "making it up" and sent him back home to Lugo. A couple of days later, M.F. again arrived at Ortiz's home claiming that Lugo "kicked him out." M.F. told Ortiz that he did not feel comfortable with Lugo and was "not eating good" because Lugo was not using food stamps to buy groceries. Ortiz reported the incidents to the police and has been housing M.F. ever since. Ortiz encouraged M.F. to keep in contact with Lugo, but he "really doesn't want to talk to her."

¶ 8    Iris Williams, vice president of foster care licensing at Aunt Martha's, testified that she first became familiar with Lugo on the day Aunt Martha's removed T.L. and A.L. from Lugo's home. Prior to work hours on that day, Lugo called Aunt Martha's to report that T.L. had been missing from the between 1 and 2 a.m. Williams immediately sent a supervisor to Lugo's home. The supervisor called the police and completed a report.[2]

¶ 9    While the police were at Lugo's home, Williams spoke to Lugo on the phone about what occurred. Lugo reported that the police had come to her house the night before because she had reported M.F. missing. Sometime around 1 or 2 a.m., Lugo was "jarred" awake by the opening and closing of the door to her home. Lugo went downstairs and discovered that T.F. and T.L. were gone. Lugo "immediately ran out" of the house and searched the area, but did not find them.

---

[2] The supervisor was no longer employed by Aunt Martha's at the time of the hearing.

Williams asked Lugo where A.L. was when she went out to look for T.F. and T.L. Lugo never replied to that question or mentioned whether she took A.L. with her.

¶ 10    Later, Williams asked Lugo why she waited so long to call the agency after she discovered T.L. missing. Lugo responded that she knew T.L. was with Nicole, so she was giving Nicole a chance to bring her back. Lugo did not contact the police. Aunt Martha's staff recovered T.L. from Nicole "with no issues." Aunt Martha's ultimately removed T.L. and A.L. from Lugo's care and placed them in a traditional foster home. It was Williams' understanding that T.F. was now in the care of her paternal grandparents.

¶ 11    DCFS investigator Josue Gutierrez testified that he investigated Lugo's case. His investigative file was admitted as an exhibit over Lugo's hearsay objection. The investigative file showed that Gutierrez interviewed M.F., who stated that Lugo was "manipulative and a bully" and had "kicked him out" on more than one occasion. Whenever Lugo kicked him out, M.F. went to Ortiz's house.

¶ 12    On May 25, 2021, Gutierrez interviewed Lugo for about 30 minutes. Lugo reported that she argued with M.F. at the front door, and M.F. was possibly at Ortiz's house, but she "wasn't sure." Gutierrez later spoke with a police detective, who opined that the children were with family, but "there seemed to be a lot of conflict between them."

¶ 13    During her testimony, Lugo denied ever locking M.F. out of her house. Lugo explained that, on the day of the first alleged lockout incident, she told M.F. that, if he would not tell her the truth, she wanted him to "go out" and "come right back in again without any attitude and explain to [her] where [he had] been." Instead, M.F. left out the backdoor. When she determined that M.F. went to Ortiz's house, she told T.F. to text Ortiz's husband that "nobody kicked [M.F.] out" and

"to tell him to come right back home." A reply text was not received. Lugo wanted a record of what M.F. was doing, because she "knew he was trying to pull something." M.F. remained at Ortiz's house. Lugo denied that the second alleged lockout incident occurred.

¶ 14    As to the incident involving T.F. and T.L., Lugo testified that Nicole called her around 2 a.m. while everyone was asleep. Lugo did not answer the phone, because she assumed that Nicole wanted to visit with the children, and it was too late. After going back to sleep, Lugo was awakened by the sound of the front door at around 6 or 7 a.m. At that time, she noticed that T.F. and T.L. were gone. Lugo "panicked" and went out the door "as fast as she could" to see if she could catch them. She did not walk outside the gate or around the block. When Lugo did not see anyone, she knew they were "long gone" and "ran right back upstairs." She was outside the house for a minute or two. Lugo checked on the A.L., who was sound asleep. Lugo called Nicole multiple times but could not reach her. She waited until her Aunt Martha's caseworker arrived at the office at 8 a.m. to report what was happening, because she knew the children were with Nicole and did not think they were in trouble. Lugo reasoned that T.F. had never run away before, and she would never go with anyone but Nicole. Lugo did not call the police right away, explaining it was close to when the caseworker was arriving at her office and Lugo knew where the children were. Lugo was in "panic mode" and knew the caseworker would resolve the issue. As to A.L., Lugo testified that when she discovered that T.F. and T.L. were missing, she immediately went outside to try to find them. When she did not see a vehicle, she ran back upstairs to check on A.L., who was still asleep.

¶ 15    On April 26, 2022, the ALJ issued a written opinion and recommendation to the Director. The ALJ concluded that the preponderance of the evidence supported indicated findings of harm based on lock out as to M.F., inadequate supervision as to T.F. and T.L., and environment injurious

to health and welfare (neglect) as to A.L. The ALJ credited Ortiz's testimony that M.F. came to her house twice after being kicked out of Lugo's home. The ALJ did not find Lugo's denial of kicking M.F. out to be credible. Regarding the inadequate supervision allegation, the ALJ found the evidence supported the allegation because Lugo waited approximately six hours to report the incident to the agency, failed to contact law enforcement, and believed the children were not in danger because they were with Nicole even though she had been determined to be unable to parent them. Regarding the injurious environment as to A.L., the ALJ did not find Lugo's testimony that she was only outside for one to two minutes credible or reliable. The ALJ also found that Lugo was not immediately forthcoming with information about leaving A.L. alone and her minimization of the incident was self-serving. The ALJ recommended that the Director deny Lugo's request to expunge the indicated findings of child neglect against her entered into the State Central Register.

¶ 16    The Director issued a final administrative decision, adopting the ALJ's findings of fact and conclusions of law, and denying Lugo's request for expungement of the indicated findings from the State Central Register.

¶ 17    Lugo filed a complaint for administrative review in the circuit court. The circuit court affirmed the Director's decision. This appeal followed.

¶ 18                                    II. Analysis

¶ 19    On appeal, Lugo challenges the Director's decision denying her request for expungement of the indicated findings of lock out, inadequate supervision, and environment injurious to health and welfare (neglect).

¶ 20    Before considering the merits of this appeal, we note the appendix to Lugo's brief includes documents such as character witness statements and police reports that are not in the appellate

record. On administrative review, we cannot consider "new or additional evidence in support of or in opposition to any finding, order, determination or decision of the administrative agency." 735 ILCS 5/3-110 (West 2022). Thus, we will not consider those materials in our analysis.

¶ 21    Our judicial review of the Director's decision to deny expungement is governed by the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2022)). 325 ILCS 5/7.16 (West 2022). In an administrative review appeal, we review the administrative agency's decision rather than the decision of the circuit court. *Cintron v. Dart*, 2022 IL App (1st) 201369, ¶ 19. The standard of review depends on whether the question is one of fact, one of law, or a mixed question of law and fact. *Medponics Illinois, LLC v. Department of Agriculture*, 2021 IL 125443, ¶ 29. Questions of law are reviewed *de novo*. *Id*. Questions of fact are reviewed against the manifest weight of the evidence. *Id*. Mixed questions of law and fact are reviewed under the clearly erroneous standard. *Id.*

¶ 22    In this case, the findings that Lugo (1) locked M.F. out of her home, (2) failed to supervise T.F. and T.L., and (3) placed A.L. in an environment where there was a likelihood of harm are questions of fact, reviewable under the manifest weight of the evidence standard. An agency's findings of fact are considered *prima facia* true and correct. *Mireles v. Dart*, 2023 IL App (1st) 221090, ¶ 56. A factual finding is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id*. The Director's finding that Lugo committed child neglect as defined in ANCRA involves a determination of whether the facts satisfy the legal standard, which is a mixed question of law and fact reviewed under the clearly erroneous standard. A reviewing court will not reverse a decision as clearly erroneous unless it has a firm conviction

that a mistake has been made. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 211 (2008).

¶ 23    A report of suspected child abuse or neglect is "indicated" when an investigation determines that credible evidence of the alleged abuse or neglect exists. 325 ILCS 5/3 (West 2022). Credible evidence of child neglect "means that the available facts, when viewed in light of surrounding circumstances, would cause a reasonable person to believe that a child was abused or neglected." 89 Ill. Adm. Code § 300.20, amended at 35 Ill. Reg. 1599 (eff. Jan. 15, 2011). The subject of an indicated report may request that DCFS expunge the report from the State Central Register and is entitled to an administrative hearing to determine whether the report should be removed. 325 ILCS 5/7.16 (West 2022). At the hearing, DCFS has the burden of proof to show that by a preponderance of the evidence the report supports the indicated finding. 89 Ill. Adm. Code 336.115(c)(2)(B) (2017). The hearing is presided over by an ALJ, who issues a recommendation on the request for expungement to the Director, who may, among other things, accept or reject that decision. 89 Ill. Adm. Code 336.120(b)(15), 336.220(a)(1) (2017). The Director's decision is the final order for purposes of appeal, and the party may seek judicial review of the denial of expungement. 89 Ill. Adm. Code 336.220(a)(1) (2017); 735 ILCS 5/3-104 (West 2022).

¶ 24    In this case, the indicated findings against Lugo are based on three allegations of harm: the lock out of M.F., inadequate supervision of T.F. and T.L., and environment injurious to health and welfare (neglect) as to A.L. We will address each allegation of harm in turn.

¶ 25                                        A. Lock Out

¶ 26    Lock out occurs when "[t]he parent or caregiver has denied the child access to the home and has refused or failed to make provisions for another living arrangement for the child." 89 Ill. Adm. Code § 300, appendix B (Allegation 84) (2017). Here, DCFS provided evidence that Lugo denied M.F. access to the home and failed to make provisions for M.F. to stay elsewhere. Gutierrez testified that M.F. had been kicked out of Lugo's house, and Lugo acknowledged that she refused M.F. access to the house, but with the option to return "without any attitude." Ortiz also testified that M.F. had been kicked out of the house more than once. There was no evidence that M.F. was scheduled to go to Ortiz's home that night. While Lugo did instruct T.F. to text Ortiz's husband, she did not investigate further when there was no response. The ALJ found Ortiz's testimony credible and Lugo's testimony not credible. We will not reweigh the evidence and the ALJ's assessment of credibility. *Plowman v. Department of Children & Family Services*, 2017 IL App (1st) 160860, ¶ 24. After reviewing the record, we cannot say the ALJ's factual findings, adopted by the Director, were against the manifest weight of the evidence. Likewise, considering the factual findings, we cannot say that the determination that those factual findings constituted a lock out was clearly erroneous.

¶ 27    Nonetheless, Lugo asserts that the ALJ's factual findings were against the manifest weight of the evidence because they relied on Ortiz's hearsay testimony, M.F. admitted that he left on his own volition, the ALJ incorrectly found that M.F. walked "several blocks" to Ortiz's home when she only lived two blocks away, and M.F. staying with Ortiz was consistent with the family's prior "care plan."

¶ 28    None of Lugo's assertions have merit. Under DCFS rules, the ALJ may "allow into evidence all inculpatory and exculpatory evidence helpful in determining whether an indicated

perpetrator abused or neglected a child" (89 Ill. Adm. Code 336.120(b)(9) (2017)) and "allow into evidence previous statements made by the child relating to abuse or neglect as hearsay exceptions" (89 Ill. Adm. Code 336.120(b)(10) (2017))." Moreover, the ALJ was charged with resolving any conflict in evidence as to the distance between Ortiz's and Lugo's house and the reason why M.F. went to Ortiz's home. See *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 540 (2006). Whether that distance was "several blocks" or two blocks is inconsequential. We will not reweigh the evidence. *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50.

¶ 29                          B. Inadequate Supervision

¶ 30    As relevant here, inadequate supervision occurs "when a child is placed at a real, significant and imminent risk of likely harm due to a parent's or caregiver's blatant disregard of parental or caregiver responsibilities of care and support." 89 Ill. Adm. Code § 300, appendix B (Allegation 74 (2017)). Relevant factors include the age of the child; the maturity level of the child; the duration of time and frequency of occurrence the child was left without care and support, including supervision; the time of day or night the child was left without care and support, including supervision; the physical distance the child was from the parent or guardian at the time the child was without care and support, including supervision; and "other factors that demonstrate that the parent or caregiver took other precautionary measures to prevent or mitigate the risk of any harm to the child." *Id.*

¶ 31    Here, DCFS presented evidence showing that T.F. at age 13 and T.L. at age 2 went missing from Lugo's home after Lugo had gone to sleep for the evening. Lugo acknowledged that she did not immediately report them missing to Aunt Martha's and did not notify the police. Lugo

explained that she believed they were with their mother. Although T.L. was found with her mother, T.F. was not. Moreover, Lugo's insistence that T.F. and T.L. were not at risk of harm because they were with Nicole disregards that the children were placed in Lugo's care because Lugo believed Nicole was not doing a good job parenting and struggled with drug addictions. The ALJ found that a preponderance of the evidence supported the indicated finding against Lugo for inadequate supervision. After reviewing the record, we cannot say that the ALJ's factual findings, adopted by the Director, were against the manifest weight of the evidence. Nor can we say that the determination that those factual findings constituted inadequate supervision was clearly erroneous.

¶ 32    Nonetheless, Lugo argues that the lack of supervision finding was unfounded because this "was an isolated and unprecedented incident." She also argues that it was reasonable for her not to call the police when discovering that the children were missing. Lugo further argues that the ALJ improperly shifted the burden of proof from DFCS to Lugo by asserting that she did not present evidence showing that the children were not at risk of harm.

¶ 33    However, even deeming this an "isolated and unprecedented incident," that does not change the finding that Lugo's reaction in this instance constituted inadequate supervision. Frequency of occurrence is only one factor for the court to consider under this allegation of harm. *Id.* We also cannot reweigh the evidence and place less weight on Lugo's decision not to contact the police when she learned the children were missing. *Plowman*, 2017 IL App (1st) 160860, ¶ 24. Additionally, the ALJ clearly understood that the burden of proof belonged to DCFS, as the ALJ's recommendation referenced that burden multiple times. Moreover, the ALJ ultimately found that DCFS had met that burden by presenting evidence that showed T.F. and T.L. were at risk of harm while they were missing. Thus, these contentions do not warrant reversal.

¶ 34                    C. Injurious Environment (Neglect)

¶ 35    An environment injurious to health and welfare (neglect), is defined as when "a child's environment creates a likelihood of harm to the child's health, physical well-being or welfare and that the likely harm to the child is the result of a blatant disregard of parent or caretaker responsibilities." 89 Ill. Adm. Code § 300, appendix B (Allegation 60) (2017). This allegation applies when "the type or extent of harm is undefined but the totality of circumstances, including inculpatory and exculpatory evidence, leads a reasonable person to believe that the child's environment may likely cause harm to the child's health, physical well-being or welfare due to the parent's or caretaker's blatant disregard." *Id*. Factors to consider include the child's age, the "child's medical condition, behavioral, mental or emotional problems, developmental disability or physical handicap," the "severity of the occurrence," the "frequency of the occurrence," the "alleged perpetrator's physical, mental and emotional abilities, particularly related to his or her ability to control his or her actions," the "dynamics of the relationship between the alleged perpetrator and the child," the "alleged perpetrator's access to the child," the "previous history of indicated abuse or neglect," the "current stresses or crisis in the home," "the presence of other supporting persons in the home," and the "precautionary measures exercised by a parent or caregiver to protect the child from harm." *Id.* All factors must be considered, but one factor by itself "may present sufficient danger to justify taking the report." *Id.*

¶ 36    Here, Lugo acknowledges that she left the home while five-month-old A.L. was asleep inside to look for T.F. and T.L. when she discovered them missing. Lugo reported to Aunt Martha's that she walked around the block looking for the missing children. At the hearing, Lugo testified that she only walked outside as far as the front gate and was outside for only a minute or two. The

ALJ found Lugo's testimony not credible or reliable and her minimization of the incident self-serving. We cannot second guess the ALJ's credibility determination. *MIFAB, Inc. v. Illinois Human Rights Comm'n*, 2020 IL App (1st) 181098, ¶ 58. The ALJ found that a preponderance of the evidence supported the indicated finding against Lugo. After reviewing the record, we cannot say that the ALJ's factual finding, adopted by the Director, of environment injurious to health and welfare to five-month-old A.L. was against the manifest weight of the evidence. Likewise, considering the factual findings, we cannot say that the determination that those factual findings constituted environment injuries to health and welfare was clearly erroneous.

¶ 37      Nonetheless, Lugo contends that the ALJ improperly found that Lugo left A.L. asleep in the home, because that basis was not discussed in the investigative report. She asserts her due process rights were violated where she could not have prepared a defense from allegations she did not know were at issue. She also contends no testimony assessed the length of time A.L. had been alone in the apartment and that it was an isolated incident.

¶ 38      As an initial matter, Lugo's due process argument is forfeited. It is well-established that "if an argument, issue, or defense is not presented in an administrative hearing, it is procedurally defaulted and may not be raised for the first time" on judicial review. *Cinkus*, 228 Ill. 2d at 212. Because Lugo did not raise the due process argument before the ALJ, the issue is forfeited for our review.

¶ 39      Further, contrary to Lugo's assertion, testimony addressed the length of time A.L. was alone in the apartment. Lugo testified she was outside for one to two minutes. Williams testified that Lugo claimed to have run down the street and around the block looking for T.F. and T.L., which a trier of fact can reasonably infer was longer than one to two minutes. The ALJ found that

Lugo was not credible or forthcoming about leaving A.L. alone or how long he was alone. We will not reweigh the evidence or reassess credibility. *Plowman*, 2017 IL App (1st) 160860, ¶ 24. Additionally, even deeming this an isolated incident, frequency was only one factor for the ALJ to consider. 89 Ill. Adm. Code § 300, appendix B (Allegation 60) (2017). Again, we will not reweigh the evidence. *Plowman*, 2017 IL App (1st) 160860, ¶ 24. Thus, these contentions do not warrant reversal.

¶ 40      In light of the findings of lock out, inadequate supervision, and environment injurious to health and welfare (neglect), we cannot say that the Director's decision to deny Lugo's request for expungement of the indicated findings of child neglect against her was clearly erroneous.

¶ 41                                    III. Conclusion

¶ 42      For the foregoing reasons, we affirm the judgment of the circuit court of Cook County

¶ 43      Affirmed.