NOTICE
Decision filed 12/19/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230495-U

NO. 5-23-0495

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| PAVAN BEJGUM, M.D., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Massac County. |
| | ) | |
| v. | ) | No. 21-MR-58 |
| | ) | |
| THE DEPARTMENT OF FINANCIAL AND | ) | |
| PROFESSIONAL REGULATION, of the State | ) | |
| of Illinois, and CECILIA ABUNDIS, Acting | ) | |
| Director of the Department of Financial and | ) | |
| Professional Regulation of the State of Illinois, | ) | |
| Division of Professional Regulation, | ) | Honorable |
| | ) | Sarah Tripp, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The plaintiff failed to establish that the Director abused her discretion in denying the plaintiff's motion for rehearing. The final order of the Department and its Director, indefinitely suspending Dr. Bejgum's medical license for a minimum of four years and imposing a $15,000 fine, is affirmed.

¶ 2    The plaintiff, Pavan Bejgum, M.D. (Dr. Bejgum), filed a complaint seeking judicial review of the final order of the Department of Financial and Professional Regulation of the State of Illinois (Department), and Cecilia Abundis, Acting Director of the Department's Division of Professional

Regulation (Director),[1] denying Dr. Bejgum's request for rehearing and ordering the indefinite suspension of his medical license for a minimum of four years and a $15,000 fine. The circuit court of Massac County affirmed the Department's final order, and Dr. Bejgum appealed. On appeal, Dr. Bejgum claims that the Director erred in denying his request for rehearing to present two witnesses who were allegedly unavailable at the time of the formal administrative hearing and whose testimony would contradict the testimony of the Department's occurrence witness. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4     On March 5, 2020, the Department's Division of Professional Regulation filed an administrative complaint against Dr. Bejgum and sought to impose disciplinary action under section 22 of the Medical Practice Act of 1987 (Medical Practice Act) (225 ILCS 60/22 (West 2020)). The Department alleged that Dr. Bejgum was employed as a licensed physician,[2] providing medical care at Massac Memorial Hospital and its patient clinic in Metropolis, Illinois, between June 10, 2018, and September 7, 2018; that while employed at Massac Memorial Hospital, Dr. Bejgum engaged in (a) unprofessional or unethical conduct of a character likely to deceive, defraud, or harm the public and (b) immoral conduct in the commission of an act of sexual misconduct related to his practice; and that said conduct constituted proper grounds for disciplinary action under section 22(A)(5) and section 22(A)(20) of the Medical Practice Act (225 ILCS 60/22(A)(5), (A)(20) (West 2020)). Specifically, the Department alleged that on June 15, 2018,

---

[1]According to the record, Cecilia Abundis was the Acting Director of the Illinois Department of Financial and Professional Regulation's Division of Professional Regulation on November 28, 2021, when she entered the final order to indefinitely suspend Dr. Bejgum's medical license. The parties, however, have referred to Cecilia Abundis as "Director," and, for consistency, we retain that title throughout this disposition.

[2]Dr. Bejgum received his Illinois medical license on August 23, 2010. Dr. Bejgum began working at Massac Memorial Hospital in June 2017, and he resigned September 7, 2018.

J.E., a female patient, attended a scheduled appointment with Dr. Bejgum at Massac Memorial Hospital's clinic following J.E.'s hospitalization for double pneumonia; and that during the appointment, Dr. Bejgum directed inappropriate sexual comments toward J.E. and improperly touched her vagina without clinical rationale or medical necessity. The Department further alleged that on or about August 30, 2018, Dr. Bejgum contacted J.E. by phone; that during the call, J.E. notified Dr. Bejgum that he had violated her trust and that he should not contact her again; that on or about September 7, 2018, Ethan May, acting on behalf of Dr. Bejgum, contacted J.E. and asked her whether she reported Dr. Bejgum's conduct to Massac Memorial Hospital and whether she would be willing to settle with Dr. Bejgum; and, that on September 12, 2018, based upon the foregoing conduct, J.E. obtained an emergency civil no-contact order against Dr. Bejgum and reported Dr. Bejgum's misconduct to Massac Memorial Hospital. The Department asserted that the foregoing conduct constituted grounds to suspend Dr. Bejgum's Illinois medical license under section 22(A) of the Medical Practice Act (225 ILCS 60/22(A) (West 2020)).

¶ 5    Dr. Bejgum filed an answer and denied the allegations in the complaint. Subsequently, the parties were directed to disclose all witnesses prior to a prehearing conference scheduled for February 2, 2021, and to produce all discovery materials by March 15, 2021.

¶ 6    A formal administrative hearing was held before an administrative law judge (ALJ) on April 29, 2021, and May 3, 2021. During the hearing, the Department called J.E., Dr. Bejgum, and two other witnesses. Dr. Bejgum testified in his defense, and he called an additional witness to support a portion of his testimony. Here, the only issue raised in this appeal is whether the Director erred in denying Dr. Bejgum's motion for rehearing to present two witnesses who were previously unavailable and who would contradict J.E.'s account of the events on June 15, 2018. Accordingly, an overview of the evidence, with a focus on the testimony pertinent to that issue, follows.

3

¶ 7    J.E. testified that Dr. Bejgum became her primary care physician in September or October 2017. J.E. had a medical history of anxiety and depression, and she went to Dr. Bejgum for medical care related to those conditions. In June 2018, J.E. was diagnosed with double pneumonia. Dr. Bejgum prescribed medication for J.E., but her condition did not improve. On June 10, 2018, J.E. was admitted to Massac Memorial Hospital for additional evaluation and treatment. She was discharged three days later. J.E. attended a follow-up evaluation with Dr. Bejgum at Massac Memorial Hospital's clinic on June 15, 2018, and she recounted what occurred during that evaluation. When J.E. arrived at the clinic for the follow-up evaluation, she was escorted into an exam room by a nurse named Rochelle Holley.[3] The nurse asked J.E. how she was doing, took J.E.'s vital signs, and then left the room. A few minutes later, Dr. Bejgum entered J.E.'s exam room. He was not accompanied by a nurse or any other staff member. Dr. Bejgum and J.E. were alone in the room. Dr. Bejgum told J.E. that she looked "sexy." He continued to comment on J.E.'s physical appearance as he began the physical exam. J.E. recalled that Dr. Bejgum tried to kiss her after listening to her lungs. Then, he placed his hand underneath J.E.'s underwear and touched her vagina. J.E. immediately pushed him away, and she stepped down from the exam table. Dr. Bejgum told J.E. she was ok. He gave her a "bear hug," and he asked if she needed money. He suggested that they should get a drink because that would make J.E. feel better. Dr. Bejgum also told J.E. he was having "inappropriate thoughts" about her, and he bit and licked his lips as he spoke. Dr. Bejgum left the exam room to fill out prescription forms. J.E. immediately went to the lobby to wait for her paperwork and prescriptions. J.E. testified that she did not return to Dr.

---

[3]Although J.E. testified that the clinic nurse's name was Rochelle Holley, the parties agree that the name of the clinic nurse was Rochelle Croach.

Bejgum for medical care. She admitted she did not immediately report the incident because she did not think anyone would believe her.

¶ 8    J.E. also recounted a later incident concerning Dr. Bejgum. On September 7, 2018, at approximately 6:56 p.m., J.E. received a message through "Facebook Messenger" from Ethan May's social media account. J.E. and Ethan attended the same high school, but she was a few years ahead of him. J.E. knew Ethan, but she was not friends with him in real life or on social media. J.E. testified that the message from Ethan's account indicated that Dr. Bejgum quit and that J.E. had something to do with it. The message continued, "Way to go girl. Getting a doctor to quit, what's your secret? LOL." J.E. wanted to know whether Dr. Bejgum had been fired, so she replied to the initial message. She received a new message from Ethan's account. Ethan asked J.E. whether she reported Dr. Bejgum and whether she might be willing to say that it was a "huge misunderstanding." Ethan also mentioned that Dr. Bejgum had "a banker." In a reply message, J.E. notified Ethan that he should not contact her again and that she "did not give a damn about money." J.E. received additional messages from Ethan's social media account that seemed threatening and disparaging, so she blocked him. On September 12, 2018, J.E obtained an emergency civil no-contact order against Dr. Bejgum. J.E. also notified the director of human resources at Massac Memorial Hospital of Dr. Bejgum's conduct and the no-contact order. J.E. testified that in November 2018, she obtained a two-year no-contact order against Dr. Bejgum. The order contained a provision that directed Dr. Bejgum to direct Ethan May and Ethan May's father to refrain from calling or messaging J.E. on Dr. Bejgum's behalf.

¶ 9    At the time of these events, Johnna Douglas was the director of human resources at Massac Memorial Hospital. Douglas testified that she received a call from J.E. on September 12, 2018. J.E. called to report an incident that had occurred while she was a patient at the hospital's clinic.

5

Douglas met with J.E. that same day. J.E. was visibly upset and shaking. J.E. showed Douglas her petition for a protective order and the emergency no-contact order that had been entered against Dr. Bejgum. Near the end of the meeting, Douglas told J.E. that Dr. Bejgum was no longer employed by the hospital and that the incident would be reported to the hospital's chief executive officer (CEO) and other appropriate individuals. Subsequently, the CEO reported the matter to the local police and the Medical Disciplinary Board.

¶ 10    Dr. John Zander, a deputy medical coordinator for the Department, was the Department's expert witness on matters related to professionalism and physician-patient boundaries. Dr. Zander testified that based upon the information available to him, there was no clinical justification for Dr. Bejgum to touch J.E.'s vagina during the follow-up evaluation for pneumonia. Dr. Zander opined that Dr. Bejgum's conduct violated the code of ethics and proper boundaries of the physician-patient relationship.

¶ 11    Dr. Bejgum testified as an adverse witness in the Department's case and as a witness in his own defense. Dr. Bejgum noted that he began working at Massac Memorial Hospital in June of 2017, and that J.E. became one of his patients in late 2017. Dr. Bejgum testified that when he saw J.E. during clinic visits, he was never alone in the room with her. A staff member was always present. Dr. Bejgum noted that the clinic visit on June 15, 2018, was a routine follow-up evaluation following the patient's discharge from the hospital. Dr. Bejgum performed a focused examination because J.E. was recovering from pneumonia. He used a stethoscope to listen to J.E.'s heart and lungs. He also examined her legs because hospitalized patients can develop deep vein thrombosis. Dr. Bejgum testified that he did not compliment J.E. on her physical appearance or make inappropriate sexual comments about her during the appointment. Dr. Bejgum denied embracing J.E. in a bear hug or kissing her during the appointment. Dr. Bejgum testified that he did not touch

6

J.E., other than during the examination. He also stated that there was no reason for him to touch J.E.'s vagina.

¶ 12     Dr. Bejgum resigned from his position at Massac Memorial Hospital on September 7, 2018. He stated that he was given an option to resign or face termination. Dr. Bejgum indicated that he had raised concerns regarding inadequate support staff and also that he had conflicts with another physician. He thought those were likely factors in the decision to terminate his employment. Dr. Bejgum testified that he only learned about J.E.'s problems with him and the social media messages Ethan May sent to J.E. after he was served with an emergency civil no-contact order on September 14, 2018. Dr. Bejgum acknowledged that he knew Ethan May's family, and that he spoke with both of Ethan's parents within a few weeks after he was served with the no-contact order. Dr. Bejgum testified that he agreed not to communicate with J.E. for two years. He did not, however, agree to the no-contact order.

¶ 13     Dr. Michael Rafati, an emergency room physician who was employed at the hospital during the relevant period, was called as defense witness. Dr. Rafati testified about a conflict that arose between Dr. Bejgum and another physician in 2018, and he opined that Dr. Bejgum was "terminated" due to the conflict. Dr. Rafati did not testify about the events involving J.E. on June 15, 2018.

¶ 14     On June 7, 2021, the ALJ issued a report and recommendation to the Department's Medical Disciplinary Board. After reviewing the testimony and documentary evidence, the ALJ found that the Department had proven the allegations against Dr. Bejgum by clear and convincing evidence and recommended the indefinite suspension of Dr. Bejgum's medical license for a minimum of four years and a $15,000 fine. In the report, the ALJ found that J.E. was a credible witness, who gave direct, responsive, and consistent testimony, and that Dr. Bejgum's testimony was, at times,

7

non-responsive, evasive, and inconsistent. In assessing the appropriate disciplinary action, the ALJ considered the evidence, the applicable law and its purposes, and the applicable aggravating and mitigating factors. The ALJ determined that the applicable aggravating factors, including the seriousness of the offense, the vulnerability of the injured party, the impact of the offense on the injured party, Dr. Bejgum's motive for the offense, his lack of contrition, and his lack of cooperation with the Department, outweighed the absence of prior disciplinary action against Dr. Bejgum's medical license in Illinois or elsewhere.

¶ 15    On June 16, 2021, the Medical Disciplinary Board issued its "Finding of Fact, Conclusions of Law, and Recommendation to the Director." The Medical Disciplinary Board adopted the ALJ's findings and conclusions and agreed with the recommended disciplinary action. On June 17, 2021, the Department issued a "Twenty Day Notice," informing Dr. Bejgum of the factual findings and the recommended disciplinary action.

¶ 16    On July 30, 2021, Dr. Bejgum filed a motion for rehearing with the Director. Dr. Bejgum argued that the Department failed to prove, by clear and convincing evidence, that he had engaged in improper sexual conduct involving a patient or otherwise violated the Medical Practice Act, and he asked the Director to reject the Medical Disciplinary Board's recommendation. In addition, Dr. Bejgum claimed he was entitled to a rehearing because of the ALJ's bias in favor of the Department, improper conduct and arguments by the Department's counsel, and significant procedural and evidentiary errors that tainted the proceedings and resulted in unfair prejudice. Dr. Bejgum also claimed that he was entitled to a rehearing so that he could present two witnesses who were previously unavailable and who would contradict J.E.'s testimony about the events on June 15, 2018. Dr. Bejgum asserted that the witnesses, Rochelle Croach and Debra Puckett, were employed at Massac Memorial Hospital's clinic at the time of the formal hearing, and that both

8

witnesses were unwilling to testify during the hearing because they feared retaliation from their employer. He further argued that both witnesses had retired and were now willing to testify. Dr. Bejgum attached an undated and unsigned, typed letter from Rochelle Croach, and an email from the email address of Debra Puckett in support of his motion for rehearing.

¶ 17 The letter from Rochelle Croach indicates that she was employed as a nurse at the Massac Memorial Hospital Clinic for 10 years. Croach served as Dr. Bejgum's clinic nurse for three or four years, and she retired "this year." Croach did not provide her specific dates of employment, or the specific date that she retired. In her letter, Croach described J.E. as "flirtatious," and Croach made sure she was with Dr. Bejgum every time J.E. came in for refills or follow-ups. Croach also referenced one clinic visit: "On June 15th, J.E. came in for medication refills, we both went into the room, while I took vitals Dr Bejgum talked to her and gave her refill, as it was a controlled substance, I have to make her sign the paper, so I took her out and made her sign and she left. Nothing happened on that day which is reportable." The year of this clinic visit was not provided in the letter.

¶ 18 The email from Debra Puckett indicates that Puckett was working as a registered nurse at Massac Memorial Hospital when Dr. Bejgum was hired as a physician, and that she often cared for Dr. Bejgum's patients when they were in the hospital. Puckett was also employed as a clinic manager at Massac Memorial Medical Clinic from April 2017 until her retirement on July 24, 2018. Puckett described Dr. Bejgum as an attentive, respectful, and caring physician. She stated that he "abided by the highest standards of medical practice" and "adhered to all the protocols, policies and procedures as established by his profession, the state law, hospital and clinic." Puckett specifically referenced one protocol. "One particular protocol was that a female patient were [*sic*] not seen or physically examined without a female attendant or his nurse present. That protocol was

9

strictly followed by Dr. Bejgum and his nurse (Rochelle Croach) at all times." Puckett also indicated that she received numerous compliments about Dr. Bejgum, but no complaints.

¶ 19    On November 28, 2021, the Director denied Dr. Bejgum's motion for rehearing and ordered the indefinite suspension of Dr. Bejgum's medical license for a minimum of four years along with a $15,000 fine. In the order, the Director addressed Dr. Bejgum's request for rehearing to present testimony from previously unavailable witnesses. In denying that request, the Director found that the witnesses were known to Dr. Bejgum prior to the formal administrative hearing and that Dr. Bejgum could have requested subpoenas to compel the witnesses' attendance at the formal hearing. The Director further found that if Dr. Bejgum believed the witnesses could have provided exculpatory testimony or testimony that contradicted J.E.'s testimony, Dr. Bejgum's failure to utilize the procedural tools available to him to obtain their testimony was "confounding." The Director also considered Dr. Bejgum's other arguments in support of his motion for rehearing and found them unpersuasive. After reviewing the evidence and the ALJ's assessment of the pertinent aggravating and mitigating factors, the Director concluded that the recommended disciplinary action was appropriate. The Director adopted the ALJ's findings and agreed that Dr. Bejgum broke the "fundamental component of the physician-patient relationship: *i.e.* trust," and that his misconduct not only harmed the patient, but also "disparaged the medical profession."

¶ 20    On December 28, 2021, Dr. Bejgum filed a complaint for judicial review in the circuit court of Massac County. Dr. Bejgum alleged that the final administrative decision was "erroneous, illegal, and void" because (1) "new evidence" directly contradicted the Department's characterization of events and the alleged victim's testimony; (2) Dr. Bejgum's due process rights were severely undermined by prejudicial conduct of the Department and the ALJ throughout the hearing; and (3) the disciplinary action was overly harsh. Dr. Bejgum sought reinstatement of his

medical license and any additional relief that the circuit court deemed just. The Department answered the complaint and filed a certified copy of the entire record of the administrative proceedings in support of the final administrative decision. Subsequently, the parties were permitted to file legal briefs in support of their respective positions.

¶ 21    In an order dated June 8, 2023, the circuit court affirmed the Director's final administrative order and denied the relief requested by Dr. Bejgum. The court determined that the Director's decision was supported by clear and convincing evidence and was not arbitrary or capricious. The court rejected Dr. Bejgum's due process claims and his request to remand the case for the purpose of presenting additional evidence. The court also rejected Dr. Bejgum's claim that the disciplinary action was overly harsh.

¶ 22                                    II. ANALYSIS

¶ 23    On appeal, Dr. Bejgum argues that the Director erred in denying the motion for rehearing to present two additional witnesses. Dr. Bejgum claims that the witnesses were previously unavailable to testify at the formal administrative hearing because they feared retribution by their employer and that the testimony of these witnesses would directly contradict J.E.'s testimony that no chaperone was present during the clinic visit on June 15, 2018.

¶ 24    Under the Medical Practice Act, all final administrative decisions of the Department are subject to judicial review pursuant to the Administrative Review Law (735 ILCS 5/3-102 (West 2020)). See 225 ILCS 60/41 (West 2020). In administrative review cases, the appellate court reviews the final decision of an administrative agency, not the decision of the circuit court. *Medponics Illinois, LLC v. Department of Agriculture*, 2021 IL 125443, ¶ 28; *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001). The applicable standard of review depends upon whether the question presented is one of fact, one of law, or a

11

mixed question of fact and law. *Medponics Illinois*, 2021 IL 125443, ¶ 29; *AFM Messenger Service*, 198 Ill. 2d at 390.

¶ 25 An administrative agency's factual findings are deemed to be *prima facie* correct and will only be reversed if they are against the manifest weight of the evidence. *Medponics Illinois*, 2021 IL 125443, ¶ 29; *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 540 (2006) (*per curiam*). An administrative agency's determination of questions of law is reviewed *de novo. AFM Messenger Service*, 198 Ill. 2d at 390. A mixed question of fact and law involves an examination of the legal effect of a given set of facts. *AFM Messenger Service*, 198 Ill. 2d at 391. An agency's determination of a mixed question of fact and law is reviewed under the clearly erroneous standard. *AFM Messenger Service*, 198 Ill. 2d at 391. Under the clearly erroneous standard, the agency's decision may only be reversed if the reviewing court is left with the definite and firm conviction that a mistake has been made. *AFM Messenger Service*, 198 Ill. 2d at 395. In addition, an administrative agency possesses broad discretion in the conduct of its hearings and the introduction of evidence, and an agency's decision is subject to reversal only if there is demonstrable prejudice to a party. See *Wilson v. Department of Professional Regulation*, 344 Ill. App. 3d 897, 907 (2003); *Bickham v. Selcke*, 216 Ill. App. 3d 453, 459 (1991) (citing *Brown v. Air Pollution Control Board*, 37 Ill. 2d 450, 756-57 (1967) (an agency must exercise its discretion "judiciously, and not arbitrarily" to satisfy the ends of justice)).

¶ 26 Administrative proceedings are governed by fundamental principles of due process. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 92 (1992). "However, due process is a flexible concept and requires only such procedural protections as the fundamental principles of justice and the particular situation demand." *Abrahamson*, 153 Ill. 2d at 92. A license to practice medicine is a property right and proceedings to revoke medical licenses

12

must comply with procedural due process guarantees. See *Hayashi v. Illinois Department of Financial & Professional Regulation*, 2014 IL 116023, ¶ 29; *Smith v. Department of Registration & Education*, 412 Ill. 332, 340-41 (1952).

¶ 27    The rules of practice governing medical disciplinary hearings are codified in Title 68, part 1110 of the Illinois Administrative Code (68 Ill. Adm. Code 1110). See 68 Ill. Adm. Code 1110.5, amended at 43 Ill. Reg. 9969 (eff. Sept. 13, 2019). The rules of practice permit parties to engage in discovery (68 Ill. Adm. Code 1110.130, amended at 43 Ill. Reg. 9969 (eff. Sept. 13, 2019)) and to request subpoenas for the attendance of witnesses or the production of books, records, documents, and other evidence (68 Ill. Adm. Code 1110.140, amended at 43 Ill. Reg. 9969 (eff. Sept. 13, 2019)). The rules of practice also permit parties to file written motions, including motions requesting a continuance or extension of time. 68 Ill. Adm. Code 1110.210(6), amended at 43 Ill. Reg. 9969 (eff. Sept. 13, 2019). Additionally, "[a]ny party or witness" may be called as an adverse witness. 68 Ill. Adm. Code 1110.230, amended at 43 Ill. Reg. 9969 (eff. Sept. 13, 2019).

¶ 28    Under the rules of practice, either party may request that "a rehearing, or additional hearings, be ordered by the Director," and a rehearing shall be ordered when the Director determines that "substantial justice has not been done." See 68 Ill. Adm. Code 1110.240(d), amended at 43 Ill. Reg. 9969 (eff. Sept. 13, 2019).

> "(e) When a rehearing or additional hearings are requested, the request shall be in the form of a motion and shall state with specificity the reasons for the request. If it is alleged that new evidence is available that was not available at the time of the hearing, the affidavit shall describe the new evidence and reasons why it was not available for use at the hearing. The Division may file a response, which shall be filed within 20 days, and, if it does so, the licensee may reply, which shall be filed within 10 days.

(f) After a motion for rehearing has been filed and a response and reply has been filed or the time therefor has passed, the Director shall enter an Order ruling on any motion for rehearing. If the motion is denied, the Director, in the same Order, shall further adopt, reject or modify the Findings of Fact and Conclusions of Law of the ALJ or the Board or both, adopt or reject the recommendation of the Board or the ALJ, and enter a decision."

68 Ill. Adm. Code 1110.240(e), (f), amended at 43 Ill. Reg. 9969 (eff. Sept. 13, 2019).

An order of the Director denying a motion for rehearing and entering a decision on the merits is a final order subject to judicial review; however, an order granting a hearing is not a final order. 68 Ill. Adm. Code 1110.240(g), amended at 43 Ill. Reg. 9969 (eff. Sept. 13, 2019).

¶ 29    In this case, Dr. Bejgum filed a motion for rehearing. He sought to present two additional witnesses whom he claimed were unavailable at the time of the formal hearing. He argued that the new evidence would directly contradict J.E.'s testimony and the Department's characterization of the events and "obliterate" any finding of fact related to J.E.'s credibility. The Director denied Dr. Bejgum's request for a rehearing. The Director specifically found that both witnesses were known to Dr. Bejgum prior to the formal hearing, and that Dr. Bejgum failed to utilize available procedural tools to secure the testimony of those witnesses. The Director did not find that Dr. Bejgum's reasons for failing to compel the witnesses' testimony were persuasive.

¶ 30    Under the rules of practice outlined above, Dr. Bejgum could have requested subpoenas to secure the attendance of these witnesses at the formal administrative hearing, or he could have filed a motion for a continuance on grounds that the witnesses were unavailable or were unwilling to appear due to fears of retribution by their employer. As the Director noted, he failed to utilize those tools. In addition, Dr. Bejgum did not comply with the rules governing a motion for rehearing to present new evidence. In accordance with the rule, when it is alleged that new evidence is

14

available that was not available at the time of the hearing, the "affidavit shall describe the new evidence and reasons why it was not available for use at the hearing." 68 Ill. Adm. Code 1110.240(e), amended at 43 Ill. Reg. 9969 (eff. Sept. 13, 2019). In this case, Dr. Bejgum provided an unsigned and undated letter from his clinic nurse, Rochelle Croach, and an email from the clinic manager, Debra Puckett. Neither witness provided a sworn statement or an affidavit. Further, the attached letter and email provided little factual support for Dr. Bejgum's motion for rehearing. In their respective statements, neither witness claimed that she was unavailable or unwilling to testify at the prior proceeding based upon a fear of employer retaliation, and neither indicated a willingness to appear for a future hearing. Substantively, Rochelle Croach's letter contained vague and conclusory statements. According to the Puckett email, Puckett retired on July 24, 2018, and therefore long before the formal administrative hearing was held in this case. Further, Puckett did not indicate that she had personal knowledge about what occurred during the clinic visit on June 15, 2018. Based upon the information in the email, Puckett could offer testimony about the clinic's protocols and Dr. Bejgum's general character and reputation. Notably, Dr. Bejgum was aware of the patient's allegations, and he testified that he was not alone with the patient, as the patient had claimed. Dr. Bejgum has offered no reason why the clinic protocols could not have been offered during the prior hearing.

¶ 31    After reviewing the administrative record, including Dr. Bejgum's motion to reconsider and the supporting attachments, the Director could have reasonably concluded that Dr. Bejgum did not establish that the witnesses were unavailable to testify at the formal hearing or that the witnesses could offer exculpatory testimony or testimony that would contradict J.E.'s testimony. The Director did not determine that substantial justice was not done and denied Dr. Bejgum's

15

motion for rehearing. After reviewing the record, we do not find that the Director's decision was an abuse of discretion.

¶ 32   Finally, we note that Dr. Bejgum contends that his motion for rehearing should have been treated as a motion to reopen proofs. Dr. Bejgum acknowledged that he did not raise this issue in his pleadings before the Director or in the circuit court. It is well-established that an issue or argument may not be raised for the first time on appeal. See *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 212 (2008) (rule of procedural default in judicial proceedings applies to administrative determinations). Accordingly, we find that this argument is forfeited, and we will not consider it.

¶ 33                                        III. CONCLUSION

¶ 34   For the reasons stated, the final order of the Department and its Director, indefinitely suspending Dr. Bejgum's medical license for a minimum of four years and imposing a $15,000 fine, is affirmed.

¶ 35   Affirmed.

16