2026 IL App (1st) 250003-U

No. 1-25-0003

Order filed April 9, 2026

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| CHRIS LOGAN, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County |
| | ) | |
| v. | ) | |
| | ) | |
| HUMAN RESOURCES BOARD OF THE CITY OF | ) | |
| CHICAGO; CITY OF CHICAGO DEPARTMENT OF | ) | No. 23 CH 9769 |
| AVIATION; CITY OF CHICAGO; SALVADOR A. | ) | |
| CICERO, in his Official Capacity as Chairman of the | ) | |
| Human Resources Board of the City of Chicago; and | ) | |
| SAMUEL L. EVANS, JR., in his Official Capacity as | ) | |
| Member of the Human Resources Board of the City of | ) | |
| Chicago, | ) | Honorable |
| | ) | Thaddeus L. Wilson, |
| Defendants-Appellees. | ) | Judge Presiding |

_____

PRESIDING JUSTICE NAVARRO delivered the judgment of the court.
Justices Lyle and Quish concurred in the judgment.

**ORDER**

¶ 1     *Held*: We affirm the decision of the Human Resources Board of the City of Chicago to uphold the discharge of plaintiff Chris Logan from his job as an aviation security sergeant with the City of Chicago Department of Aviation.

¶ 2     After being charged with violating various personnel rules of the City of Chicago (City) while working as an aviation security sergeant for the City of Chicago Department of Aviation (Department) at O'Hare International Airport (O'Hare), Chris Logan was terminated from his position. Logan received a hearing with the Human Resources Board of the City of Chicago (Board), which upheld his discharge. Logan subsequently sought judicial review in the circuit court by filing a petition for writ of *certiorari*. The court denied Logan's petition and affirmed the Board's decision. Logan now appeals, contending that the Board's decision was erroneous because its findings were contrary to the evidence and there was no cause for his discharge. For the reasons that follow, we affirm the Board's decision to uphold Logan's discharge.

¶ 3                            I. BACKGROUND

¶ 4     Logan began working for the Department at O'Hare in 1992 as an aviation security officer. In November 2017, Logan sued the City and various supervisors of the Department in federal court for racial discrimination, gender discrimination and retaliation, claiming that he was not promoted to an aviation security sergeant despite being qualified and having superior qualifications to those who were promoted to sergeant. We take judicial notice that, ultimately, the City and the various Department supervisors prevailed, predominantly through summary judgment, a decision that was upheld on appeal. *Logan v. City of Chicago*, 4 F.4th 529 (7th Cir. 2021). See *Fryzel v. Miller*, 2014 IL App (1st) 120597, ¶ 7 n.1 (taking judicial notice of federal court orders).

¶ 5     In 2019, Logan was promoted to an aviation security sergeant, though his promotion was deemed retroactive to 2017 due to a successful arbitration he filed. Two years later, Logan again sued the City in federal court for racial discrimination, disability discrimination and retaliation based on the Department allegedly engaging in discriminatory practices that hindered his

professional development, harassing him and imposing unjustified suspensions. We take judicial notice that, ultimately, the City prevailed on summary judgment (see *Logan v. City of Chicago*, No. 21 CV 5380, 2024 WL 4286957, at *1 (N.D. Ill. Sept. 25, 2024)), and Logan's appeal was dismissed for want of prosecution. (*Logan v. City of Chicago*, No. 24-2928, 2025 WL 3035100, at *1 (7th Cir. June 30, 2025)). See *Fryzel*, 2014 IL App (1st) 120597, ¶ 7 n.1.

¶ 6    Turning to the winter of 2022-2023, Logan remained an aviation security sergeant, where he was represented by The Illinois Council of Police union, which had a collective bargaining agreement with the City. Under the collective bargaining agreement, although employees were "obligated" to follow the "orders of supervisors," they were not obligated to do so where the order was "so inherently dangerous to the employee that it could cause death or serious physical harm." The collective bargaining agreement also provided that discharges were to be governed by the City's personnel rules and the applicable rules of the Board.

¶ 7    Under the City's personnel rules for its employees, in particular under Rule XVIII, Section 1, there were various causes for disciplinary action. Subsection 25 subjected an employee to discipline for insubordinate actions, including failing to carry out an order related to an employee's duty. Subsection 29 subjected an employee to discipline for failing to act as needed to complete an assignment safely. Subsection 38 subjected an employee to discipline for being inattentive to his duties. Subsection 39 subjected an employee to discipline for incompetence or inefficiency in performing his duties. Subsection 48 subjected an employee to discipline for violating any departmental rule. And subsection 50 subjected an employee to discipline for conduct unbecoming of an officer or public employee.

¶ 8    Based on Logan's conduct while working as a sergeant at O'Hare on December 25, 2022, namely, inactivity during his shift, and on January 17, 2023, namely failing to respond to a call of a suspicious package after being ordered to do so by two superiors, the City alleged that Logan violated subsections 25, 29, 38, 39, 48 and 50 of its personnel rules. In March 2023, Logan received a letter from Jamie L. Rhee, the Department's commissioner, informing him that he had been discharged as a sergeant. Thereafter, Logan requested a hearing with the Board.

¶ 9    During the hearing, in the City's case, the evidence revealed that the Department utilized a paramilitary chain-of-command system of authority with lieutenants, also called shift supervisors, superior to sergeants and sergeants superior to officers. In this system, individuals with less senior rank were required to obey orders from individuals with more senior rank. Every day, the Department had three shifts called watches. Each watch had a commander, who was the supervisor over all other personnel. During each shift, one sergeant acted as the administrative sergeant, and that sergeant would remain inside an administrative building, performing administrative tasks for the watch. All other sergeants were expected to be in the field while on duty. Additionally, one sergeant on each watch was designated the late sergeant, and that sergeant would be the one required to respond to any late calls and potentially stay beyond their watch, if necessary. Occasionally, a sergeant could be given conflicting orders from a lieutenant, and in those situations, the lieutenants would work out the priority among themselves.

¶ 10    The essential duties of a sergeant included monitoring the work of officers, assisting on special security matters with the Chicago Police Department, monitoring access to restricted or secured areas, and patrolling the airport terminal areas. The working conditions of an officer included an airport environment as well as outside, with exposure "to all weather conditions."

According to the testimony of Akram Hasan, a lieutenant, second watch commander and Logan's direct supervisor, to comply with the essential duties of a sergeant, one was expected to spend between five and seven minutes at least once a shift, ideally twice a shift, with the officers they supervise and ensure all biometric equipment was working.

¶ 11     During Logan's time as a sergeant, he received multiple suspensions, beginning with a 5-day suspension based on two incidents in January 2020. Logan next received an 8-day suspension based on an incident in March 2020, a 15-day suspension based on an incident in June 2020, and finally, a 29-day suspension based on an incident in November 2020.

¶ 12     On December 25, 2022, Logan was working the second watch and supervising 14 officers, according to a field log he completed during his shift, which was admitted into evidence. The log revealed that Logan reported for duty at 4:30 a.m., participated in a roll call an hour later, took a lunch at 11:30 a.m., performed "paperwork" at noon and ended his shift at 12:30 p.m. Logan noted on the log that he observed all 14 officers at the 5:30 a.m. roll call, which, according to Hasan, was insufficient because that was the time officers reported for their shifts, meaning that Logan did not observe the officers at their posts during their shifts. On Logan's field log, next to a location to note the time he performed a biometric access check, Logan wrote "DNA," which Hasan interpreted as "[d]oes not apply." Based on door access data, which was admitted into evidence, Logan only swiped his security badge at the administrative office during his shift.

¶ 13     The following day, after reviewing Logan's field log, Hasan e-mailed Logan asking him to explain the log's emptiness. Logan responded that he observed the officers during roll call, asked what further explanation Hasan needed, and remarked that Hasan continued to "harass and bully" him. Hasan replied that, based on the log, Logan never left his station, failed to perform his duties

as a sergeant, and continued to disregard orders without considering operational needs and the general safety of the public. Logan answered, explaining that "[i]t was below zero outside" and no officers requested assistance during his shift. Logan also stated: "[T]here were no officers assigned to me as no shift supervisor was on duty to issue the daily sergeant's assignment." According to weather data, which was admitted into evidence, near the beginning of Logan's shift, it was two degrees Fahrenheit. During the hearing, Hasan remarked that cold weather did not excuse Logan's inactivity because his essential duties required him to be out in the field.

¶ 14    On January 17, 2023, Logan was also working the second watch. During Logan's shift, Hasan asked William Kilroy, a lieutenant and third watch commander, who testified at the hearing, to attend a security meeting, which was not close to Kilroy's location. Because one of the lieutenants' vehicles had been totaled the day before in an accident and the other lieutenant's vehicle was already in use, Kilroy asked to borrow Logan's vehicle. Logan gave Kilroy the keys, and Kilroy reminded Logan that he was the "late" sergeant that day. Kilroy then told Logan: "I need you to answer and respond to all calls for a supervisor up until" the end of his shift, which was 2 p.m. that day. According to Kilroy, Logan responded with laughter and noted that Kilroy had just taken his vehicle. In response, Kilroy instructed Logan to take an officer's vehicle, if necessary, but regardless, "they're your calls."

¶ 15    At 1:30 p.m., the second watch sergeants were nearing the end of their shifts, and the third watch sergeants were just beginning their shifts, creating a 30-minute overlap between the two. Around this time, Kilroy happened to turn on his radio during the security meeting and overheard a dispatcher at the O'Hare Communications Center attempting to give Logan an assignment concerning a suspicious package at the O'Hare post office. Although the post office was federal

property, it was located at O'Hare. According to Kilroy, a suspicious package incident was not unusual, and in each instance, a sergeant was required to respond. The sergeant's role was to assist the Chicago Fire Department and Chicago Police Department with crowd control and traffic, but there was no expectation for a sergeant to be actively involved in resolving the incident. Rather, a sergeant was expected to stay a safe distance away from the potentially dangerous package.

¶ 16    The recording of the radio call was admitted into evidence, but is not included in the record on appeal, though the transcript of the radio transmissions, also admitted into evidence, is included in the record on appeal. Summarizing the recording at the hearing, Kilroy remarked that Logan was given an assignment, but responded that he could not accept it because Kilroy had taken his vehicle. Upon hearing this, Kilroy radioed in and stated, according to the transmission transcript: "[T]he sergeant can grab another car." Yet, Kilroy was concerned that Logan was not going to obey the order, so Kilroy called Michael Joyce, a lieutenant on the third watch, who testified at the hearing, and told Joyce to reiterate the order to Logan. Because Kilroy, as the watch commander, was Joyce's supervisor, Joyce immediately acted and found Logan, who was sitting in his office. According to Joyce, since Logan did not have a vehicle, Joyce found keys to another vehicle and told Logan, "go out there and respond to that call." Logan replied affirmatively, and that was the last interaction the two had that day. After being ordered to respond, Logan never told Kilroy that his order conflicted with any other order.

¶ 17    Instead of responding himself, Logan gave the keys to Joseph Harn, the administrative sergeant for the third watch that day, who testified at the hearing, and told Harn there was a call necessitating a response. At the time, Harn was unaware that both Kilroy and Joyce had ordered Logan to respond. But because Logan, though identical in rank, was more senior in years of

experience, Harn acquiesced and responded. Ultimately, the suspicious package turned out to be a fake grenade. Afterward, Kilroy did not write a report about Logan's conduct because he e-mailed Hasan and assumed Hasan would handle any further issues as Logan's direct supervisor.

¶ 18 The evidence at the hearing also showed that, in August 2017, Andrew Velasquez III, the managing deputy commissioner of the Department, issued Directive No. 17-02, titled "Disturbance and Medical Response Protocol." The directive established the roles and responsibilities of aviation security personnel in handling "disturbances" and medical emergencies at O'Hare and Midway International Airport (Midway), and repealed all prior issuances on disturbance response protocols. The directive generally outlined that aviation security personnel were not to respond to disturbances, including boarding an aircraft, unless requested by the Chicago Police Department. The directive did not define a "disturbance." Kilroy testified that the directive did not apply to suspicious package incidents, but rather applied to incidents involving members of the public or airport employees. According to Kilroy, the directive was drafted after an incident where aviation security officers forcibly removed Dr. David Dao, a passenger from a United Airlines flight. Kilroy explained that the directive was, in part, intended to prevent another "Dr. Dao" situation.

¶ 19 Following the City's evidence, Logan testified. In explaining his actions on December 25, 2022, Logan asserted that he fulfilled his duties by observing officers at their posts by watching live video of them, and the requirement of supervising officers in the field did not "differentiate" between viewing in person or by video. Although Logan acknowledged only writing in his field log that he observed the officers during roll call, he stated that Hasan "never asked" him to write anything about viewing officers remotely. Logan also asserted that he did not mention observing the officers remotely to Hasan via e-mail because he felt "it was insignificant." Additionally,

Logan remarked that his field log was bare that day because he was the "acting watch commander," as there was no lieutenant on duty and no more senior sergeants than him in years of experience. While Logan acknowledged that Sergeant Gregory Crisler signed a Department attendance sheet from that day as the "watch commander," Logan remained adamant that he was the acting watch commander that day. Logan explained that Crisler was the administrative sergeant that day, and Crisler signed the sheet because he had prepared it.

¶ 20    In explaining his actions on January 17, 2023, Logan stated that, toward the end of his shift, Hasan ordered him to perform various administrative tasks. While he was performing those tasks, a call came over the radio for a third watch supervisor, and the only third watch sergeants available were Harn, Jorge Rodriguez and Terry Truitt. After none of them responded to the call, Logan answered and learned about the suspicious package incident. Logan attempted to find a lieutenant, and while searching for one, Joyce intercepted him and gave him the vehicle keys to respond. Although Logan did not believe either Kilroy or Joyce had given him a direct order to respond, Logan intended to respond to the call, even though the order to respond conflicted with Hasan's order for Logan to perform administrative duties. During other parts of his testimony, however, Logan asserted that he did not "perceive" the suspicious package call as being in conflict with the order from Hasan. Nevertheless, Logan could not immediately respond because he did not have a radio, so he called Harn, who had his radio. Logan informed Harn that a third watch officer was responding to the call. Instead of giving Logan the radio back, Harn decided to respond because he was a third watch sergeant.

¶ 21    After learning about the allegations against him based on the events of January 17, 2023, Logan asserted that he was unable to give his side of the story and was never asked to explain his

actions by Hasan or any other supervisor except in a response letter to Rhee, the Department Commissioner, when he learned his employment was in peril. Logan told Rhee, in part, that he should not be disciplined for his actions on January 17, 2023, because responding to the scene of a suspicious package was inherently dangerous.

¶ 22    Additionally, Logan discussed an October 2017 report from the City of Chicago Office of Inspector General (OIG), which was admitted into evidence. That report highlighted an OIG investigation into the Dr. Dao incident, which found that four Department employees escalated an innocuous situation into the violent removal of Dr. Dao from a United Airlines aircraft. According to the report, the Department acted on the OIG's recommendations by issuing a statement of intent to make clear that aviation security personnel provide security services, not police services. In accordance with its statement of intent, the report indicated that the Department was reviewing its policies. Logan asserted that the OIG report together with Directive No. 17-02 meant that aviation security personnel were not to respond to suspicious package calls, which he believed constituted disturbances, and the directive superseded any contrary order from a supervisor.

¶ 23    Following the hearing, a hearing officer found that the City proved by a preponderance of the evidence that Logan violated Subsections 29, 38, 39, 48 and 50 of Section 1 of the City's Personnel Rule XVIII on December 25, 2022. The hearing officer found it undisputed that Logan never went into the field that day, which was contrary to the expected duties of a sergeant. The hearing officer highlighted that Logan raised various explanations for his conduct, including his ability to observe the officers remotely and his role of being the acting watch commander that day. However, the hearing officer found his explanations "contradictory and not credible" because

neither were included in his contemporaneous e-mail to Hasan and Crisler had signed the Department's attendance sheet that day as acting watch commander.

¶ 24     The hearing officer also found that the City proved by a preponderance of the evidence that Logan violated Subsections 25, 29, 38, 39 and 50 of Section 1 of its Personnel Rule XVIII on January 17, 2023. The hearing officer found it undisputed that both Kilroy and Joyce instructed Logan to respond to the suspicious package call, but Logan failed to obey the orders. The hearing officer highlighted Logan's defenses to his conduct, including that Kilroy and Hasan's orders conflicted, Logan's collective bargaining agreement prohibited him from responding to an inherently dangerous situation and the Dr. Dao incident changed the responsibilities of sergeants responding to disturbances. However, the hearing officer observed that if Logan was concerned about a conflict in the orders, he would have raised the issue with Kilroy. The hearing officer also rejected Logan's defenses based on his union's collective bargaining agreement and Dr. Dao, finding that responding to a suspicious package was not inherently dangerous and responding to such a call would not lead to another Dr. Dao situation.

¶ 25     After finding sufficient evidence that Logan violated the City's personnel rules, the hearing officer recommended that the Board enter a decision upholding Logan's discharge. Thereafter, Logan sent a support letter from Chicago Alderman Chris Taliaferro to the Board. In September 2023, the Board, consisting of Salvador A. Cicero, as chairman, and Samuel L. Evans, Jr., as a member, issued a decision upholding Logan's discharge. Although the Board's decision did not expressly adopt the hearing officer's findings, its decision echoed them almost verbatim. Additionally, the Board asserted that it did not consider the support letter from Taliaferro, "as it was *ex parte* and presented after the close of evidence."

¶ 26    In December 2023, Logan filed a petition for writ of *certiorari* in the circuit court seeking judicial review of the Board's decision. Following briefing, the circuit court denied Logan's petition. This appeal followed.

¶ 27                                II. ANALYSIS

¶ 28    Logan contends that the Board's decision to uphold his discharge was in error because its findings were contrary to the evidence and there was no cause for his discharge.

¶ 29    Logan sought judicial review of the Board's decision pursuant to a common law writ of *certiorari*. Generally, an administrative decision is reviewed under the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2022)). When, as here, there is no statute adopting the Administrative Review Law or providing a method for review of the decision of an administrative agency, a writ of *certiorari* provides the method of review. *Hanrahan v. Williams*, 174 Ill. 2d 268, 272 (1996). Nevertheless, the standards of review through a writ of *certiorari* "are essentially the same" as review under the Administrative Review Law. *Id.* Given this, we will follow the principles of review used under the Administrative Review Law. *Gwozdz v. Board of Education of Park Ridge-Niles School District No. 64*, 2021 IL App (1st) 200518, ¶¶ 29-30.

¶ 30    In administrative review, we review the decision of the administrative body, here the Board, rather than that of the circuit court. *Medponics Illinois, LLC v. Department of Agriculture*, 2021 IL 125443, ¶ 28. In reviewing a decision of the Board to uphold a discharge, there is a two-step framework. *Ehlers v. Jackson County Sheriff's Merit Comm'n*, 183 Ill. 2d 83, 89 (1998). First, we determine whether the Board's "finding of guilt is contrary to the manifest weight of the evidence." *Walsh v. Board of Fire & Police Commissioners of Village of Orland Park*, 96 Ill. 2d 101, 105 (1983). Under this standard, "[w]e do not reweigh the evidence or substitute our judgment

for the" Board. *Cintron v. Dart*, 2022 IL App (1st) 201369, ¶ 19. A finding is against the manifest weight of the evidence only if the opposite finding is clearly evident. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). If the Board's findings are not contrary to the manifest weight of the evidence, we next determine whether the Board's findings "supported its conclusion that cause existed for *** discharge." *Ehlers*, 183 Ill. 2d at 89.

¶ 31                                    A. The Board's Findings

¶ 32     We now turn to the Board's findings. As a preliminary matter, in his opening brief, Logan does not raise any argument that the Board's findings related to his conduct on December 25, 2022, are against the manifest weight of the evidence. While in his reply brief, Logan maintains that he does address the December 25, 2022, conduct, Logan's sole focus is on the Board's findings related to his conduct on January 17, 2023. Thus, as to step one of our analysis, Logan has forfeited any challenge that the Board's findings related to his December 25, 2022, conduct are against the manifest weight of the evidence. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited ***.").

¶ 33     As a result, for step one, we focus solely on the Board's findings related to Logan's conduct on January 17, 2023. As noted, the Board found that, on that date, Logan violated various subsections of the City's personnel rules by disobeying the direct orders of two superiors, Kilroy and Joyce, to respond to the suspicious package incident, and it rejected Logan's various defenses. Logan concedes that he did not personally respond to the suspicious package call, but rather argues the Board erred because he never received an order to personally respond. The evidence at the hearing directly belies this argument. Kilroy twice directly told Logan to personally respond to the call. First, when Kilroy left for the security meeting, he told Logan: "I need you to answer and

respond to all calls for a supervisor up until" the end of Logan's shift. Kilroy immediately added: "[T]hey're your calls." Second, on the radio, after Logan informed the O'Hare Communications Center that he did not have a vehicle, Kilroy interjected and stated: "[T]he sergeant can grab another car." Reiterating Kilroy's order, Joyce gave Logan keys to another vehicle and told Logan: "[G]o out there and respond to that call." The evidence plainly reveals that Logan had direct orders from Kilroy and Joyce to personally respond to the suspicious package call, and the Board therefore properly found as much. Moreover, Logan cannot credibly argue that, because he caused Harn to respond, that is sufficient to constitute Logan himself responding. Kilroy and Joyce were clear that they wanted Logan to respond, not another sergeant. Furthermore, even though it might have been more cost-effective for Harn, a third watch sergeant, to respond to the call instead of Logan, a second watch sergeant, due to overtime compensation concerns, that does not relieve Logan of the responsibility of obeying direct orders from his supervisors.

¶ 34    Logan also argues that, to the extent there was a direct order to personally respond, Kilroy and Joyce's orders conflicted with Hasan's order for Logan to perform administrative duties. However, according to Kilroy, Logan never told him his order conflicted with any other order, and the proper procedure for when two superiors give a conflicting order is to alert the superiors to the conflict and have them determine the priority. Although Logan testified at one point that he believed Kilroy and Joyce's orders conflicted with Hasan's order, he also testified that he did not believe the orders conflicted. Assuming as true that Hasan gave Logan administrative duties, whether that order conflicted with Kilroy and Joyce's orders such that Logan did not have an obligation to respond to the suspicious package call is an evidentiary issue that had to be resolved by the Board. See *Bless v. Cook County Sheriff's Office*, 2024 IL App (1st) 230256, ¶ 39 ("The

board's finding is conclusive here because it is not a reviewing court's role to reevaluate credibility or resolve conflicting evidence."). Given the conflicting evidence, we have no basis to disturb the Board's rejection of Logan's defense based on allegedly conflicting orders.

¶ 35    Next, Logan posits that the Board erred by failing to discuss the OIG report, which detailed the Department's failings during the Dr. Dao incident, and Department Directive No. 17-02, which generally prohibited aviation security personnel from responding to disturbances. Although the Board did not address the OIG report or the Department directive explicitly, the Board did reject any defense based on them by finding that responding to the suspicious package call would not have led to a Dr. Dao situation, in essence, finding the OIG report and Department directive inapplicable to a suspicious package call. Regardless of whether the Board discussed Department Directive No. 17-02, Logan asserts that the directive completely justified his failure to respond.

¶ 36    At the hearing, Kilroy testified that the directive did not apply to suspicious package incidents, but rather applied to incidents involving members of the public or employees, and was issued to prevent another Dr. Dao situation. Conversely, Logan testified that it did apply to the suspicious package situation and provided him a legitimate reason not to respond because the directive, issued by Velasquez, the Department's managing deputy commissioner, superseded any order from Kilroy or Joyce. Kilroy and Logan had different interpretations of Department Directive No. 17-02, and the Board implicitly found Kilroy's interpretation to be more credible. As with Logan's previous argument, this one involves conflicting testimony and the credibility of witnesses, issues eminently within the province of the Board to resolve. See *id.* In turn, we have no basis to disturb the Board's findings on this matter. See *id.*

¶ 37 Still, Logan argues that the plain language of Department Directive No. 17-02 belies Kilroy's testimony. We disagree. As discussed, the directive established the roles and responsibilities of aviation security personnel in handling "disturbances" and medical emergencies at O'Hare and Midway. But critically, the directive never defined "disturbances." And while Logan testified that the directive and OIG report were related, the OIG report mentions nothing about suspicious package incidents. Rather, the OIG report was confined solely to highlighting the Department's failings in responding to the Dr. Dao incident.

¶ 38 Nonetheless, Logan cites to a document titled "Review of Chicago Department of Aviation's Security Division" issued by then-Department Commissioner Ginger S. Evans, which Logan claims specifically excludes aviation security personnel from responding to bomb threats. However, in citing to the document, Logan concedes the document was never presented as evidence during his hearing. Although this document could potentially be subject to judicial notice as a public record (see *City of Centralia v. Garland*, 2019 IL App (5th) 180439, ¶ 10), as suggested by Logan, we cannot consider evidence that was never presented to the Board. See *Maskevich v. Illinois Department of Employment Security*, 2022 IL App (1st) 210779, ¶ 17. We therefore decline to address his argument based on this document.

¶ 39 Logan further posits that his union's collective bargaining agreement, which excused disobedience to orders that were inherently dangerous, justified him in not responding to the suspicious package call. In rejecting this argument, the Board found that responding to a suspicious package call was not so inherently dangerous to excuse Logan's insubordination. At the hearing, there was evidence adduced supporting the Board's rejection of this defense. Kilroy testified that a sergeant's role during a suspicious package incident—something that was not uncommon—was

to assist the Chicago Fire Department and Chicago Police Department with crowd control and traffic, but there was no expectation for a sergeant to be actively involved in resolving the incident. Rather, a sergeant was expected to stay a safe distance away from the potentially dangerous package. Given this evidence, the opposite finding—specifically, that responding to a suspicious package incident for a sergeant would be inherently dangerous—is not clearly evident. See *Abrahamson*, 153 Ill. 2d at 88. We therefore have no basis to disturb the Board's rejection of Logan's defense based on his union's collective bargaining agreement.

¶ 40    In sum, there was ample evidence supporting the Board's findings related to Logan's conduct on January 17, 2023, such that its findings cannot be disturbed. Although we agree with Logan that, when reviewing an administrative agency's decision, our deference under the manifest-weight standard of review "is not boundless" (see *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 507 (2007)), each of the arguments presented by Logan on appeal relates to the weight of evidence, the credibility of witnesses or the resolution of conflicting evidence. When those are the issues on appeal, we must respect our standard of review and refrain from reweighing the evidence or judging the credibility of witnesses. See *Cintron*, 2022 IL App (1st) 201369, ¶ 19. Consequently, the Board's findings are not against the manifest weight of the evidence.

¶ 41                              B. Cause for Discharge

¶ 42    We now turn to the second step in analyzing the propriety of the Board's decision to uphold Logan's discharge, where we determine whether the Board's "findings of fact supported its conclusion that cause existed for *** discharge." *Ehlers*, 183 Ill. 2d at 89. " 'Cause' has been defined as 'some substantial shortcoming which renders continuance in his office or employment

in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for his not longer occupying the place.' " *Id.* (quoting *Fantozzi v. Board of Fire & Police Commissioners*, 27 Ill. 2d 357, 360 (1963)). "[A]lthough an agency has broad discretion in determining what constitutes a proper cause for discharge, the discharge must be based upon substantial misconduct or incapacity which 'does not include conduct which is so trivial as to be unreasonable and arbitrary.' " *Roman v. Cook County Sheriff's Merit Board*, 2014 IL App (1st) 123308, ¶ 145 (quoting *Holden v. Police Board of the City of Chicago*, 324 Ill. App. 3d 862, 868 (2001)). Even if we would have punished the individual more leniently, we may only reverse the Board's conclusion that cause for discharge exists if its finding was unreasonable, arbitrary or not related to an employee's service requirements. *Ehlers*, 183 Ill. 2d at 89; *Krocka v. Police Board of the City of Chicago*, 327 Ill. App. 3d 36, 48 (2001).

¶ 43    In the instant case, the Board's conclusion that cause exists to uphold Logan's discharge was not arbitrary, unreasonable or unrelated to his service requirements. Given that Logan was an aviation security sergeant in charge of supervising several aviation security officers at O'Hare, his neglect of his duties during one shift and his disobedience of direct orders from his superiors on a subsequent shift demonstrate substantial shortcomings rendering his continued employment as a sergeant detrimental to the Department. See *Launius v. Board of Fire & Police Commissioners of the City of Des Plaines*, 151 Ill. 2d 419, 423-24, 444-45 (1992) (affirming an administrative agency's decision to discharge a police officer as "neither unrelated to the needs of the service nor arbitrary and unreasonable" after the officer "abandoned his post" and " 'refused to perform his duties as a police officer' " for the majority of his shift even though he left his shift over concerns about flooding at his home, and the safety of his wife and two young children); *Sangirardi v.*

*Village of Stickney*, 342 Ill. App. 3d 1, 18 (2003) (affirming an administrative agency's decision to discharge a police officer as neither unreasonable nor arbitrary where he disobeyed a proper order to undergo a fitness examination and provide the results to the village police chief because "[d]isobedience to a proper order given by a superior officer is cause for discharge").

¶ 44    Rather than arguing the Board's conclusion that cause exists to uphold his discharge is arbitrary, unreasonable or unrelated to his service requirements, Logan points to several other allegedly nefarious considerations he believes influenced the Board's decision. For one, Logan posits that none of his superiors disciplined him for the incidents. Instead, according to Logan, it was the City's law department, which lobbied for his discharge. Logan asserts that the involvement of the City's law department in his discharge represents a conflict of interest because it had defended the City in the federal lawsuits he had initiated on the basis of racial discrimination. Logan, however, never advanced this theory before the Board. "As a general rule, issues or defenses not raised before the administrative agency are deemed waived and cannot be raised for the first time on administrative review." *Arvia v. Madigan*, 209 Ill. 2d 520, 526 (2004). Logan cannot raise his conflict-of-interest argument now for the first time.

¶ 45    Logan next argues in his opening brief that his prior suspensions of 5 days, 8 days, 15 days and 29 days are not final because he is still in the process of having them arbitrated. According to Logan, under the City's progressive discipline policy, if any one of those suspensions were to be vacated or lessened as a result of arbitration, it would have a cascading effect on his current discharge. As noted by the City and Department in their appellees' brief, following the filing of Logan's opening brief, an arbitrator retroactively reduced his 5-day suspension to 2 days, his 8-

day suspension to 5 days, and vacated his 15-day suspension. However, the arbitrator upheld Logan's 29-day suspension.

¶ 46   While Subsection (a) of Section 2 of Rule XVIII of the City's Personnel Rules "approves of the concept of progressive and corrective discipline *** and recommends its use when appropriate," the subsection does not mandate its use, as the City "uses progressive discipline at its discretion and does not solely rely on this concept in every instance when taking disciplinary action." Rather, "the department head, or her/his designee, has the discretion to determine what degree of discipline is appropriate after weighing all the situational factors involved in the misconduct." In turn, Rhee, the Department's commissioner, did not need to rely on progressive discipline when discharging Logan based on his conduct from December 25, 2022, and January 17, 2023. But even if the City used progressive discipline in discharging Logan, and as he notes, the City argued during his hearing that his discharge was appropriate under a progressive discipline policy, such a policy supports discharge. Notably, Logan still received three suspensions as a sergeant of varying lengths, including one of nearly a month, before the December 25, 2022, and January 17, 2023, incidents. His conduct of both days, neglecting his duties as a sergeant and disobeying direct orders of supervisors, make discharge an appropriate escalation under a progressive discipline policy. Therefore, the Board's decision to uphold Logan's discharge remains firm despite the fact that two of Logan's four suspensions were reduced in length and one of the suspensions was vacated.

¶ 47   Additionally, Logan asserts that the Board erred by not considering the letter of support submitted by Chris Taliaferro, a Chicago alderman. An administrative agency has discretion on what evidence to consider, and its decision on such matters will not be disturbed absent an abuse

of that discretion. *McDonald v. Board of Trustees of Fire & Police Commissioners of the Village of Maywood*, 2025 IL App (1st) 231616, ¶ 150. Logan correctly observes that an employee's "work record" and other "situational factors" are important considerations in determining the degree of discipline to be imposed under the City's personnel rules. But because Logan submitted the letter after the close of evidence in his hearing and after the hearing officer had issued his recommendation, Logan deprived the City of an opportunity to challenge the statements in the letter and deprived the hearing officer of an opportunity to consider the letter. As such, the Board did not abuse its discretion in declining to consider the letter as untimely and submitted *ex parte*.

¶ 48     Lastly, in Logan's reply brief, he highlights that, after he filed his opening brief, the City of Chicago Commission on Human Relations (Commission) issued a final ruling on a complaint he had filed alleging racial discrimination, age discrimination and retaliation in connection with him not being promoted to the position of shift supervisor, also known as a lieutenant. The Commission ruled that the Department violated the Chicago Human Rights Ordinance (Chicago Municipal Code § 6-10-010 *et seq.* (amended Apr. 16, 2025)) by discriminating against Logan based on race and retaliated against him for making complaints of discrimination. Logan posits that his discharge and the allegations levied against him must be viewed within the context of his successful discrimination complaint against the Department, which he contends undermines the Board's justification for upholding his discharge.

¶ 49     The City and Department, however, posit that Logan never raised any argument to the Board that his discharge was related to racial discrimination or retaliation. To this end, they filed a motion to strike any references to the Commission's ruling from Logan's reply brief, which we took with the case. Instead of striking portions of Logan's reply brief, we simply adhere to the

appellate principles that a reply brief must be confined strictly to "replying to arguments presented in the brief of the appellee" (Ill. S. Ct. R. 341(j) (eff. Oct. 1, 2020)) and theories not raised before the Board cannot be raised for the first time on administrative review. See *Arvia*, 209 Ill. 2d at 526. As such, we deny the City and Department's motion to strike. Nevertheless, we note that, even if we were to consider the Commission's ruling, its findings of racial discrimination and retaliation in connection with Logan not being promoted to shift supervisor are not mutually exclusive with the Board's finding of cause for discharge. This is especially true where Logan's complaint predated the conduct at issue in this case and the supervisors referenced in the Commission's ruling are not the same supervisors in this case.

¶ 50                                  III. CONCLUSION

¶ 51      For the foregoing reasons, we affirm the decision of the Board, and we deny the City and Department's motion to strike.

¶ 52      Affirmed; motion to strike denied.